**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

COURTNEY DAVIS, EMPLOYEES COMMITTED
FOR JUSTICE, OLIN SINGLETARY,
GLADYS ALSTON and CARRIE RICE, et al.,

       **Plaintiffs,**     **DECISION AND ORDER**
 v.              **04-CV-6098**

EASTMAN KODAK COMPANY,

       **Defendant.**

---

### Preliminary Statement

Plaintiffs commenced this action asserting class-wide discrimination claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the New York Human Rights Law, 15 N.Y. Exec. Law § 291 *et seq.*("HRL"), and 42 U.S.C. § 1981 ("Section 1981"). The Third Amended Complaint alleges that "Kodak has engaged in an ongoing pattern and practice of discrimination against its African American Employees," including discrimination in compensation, promotions, wage and job classifications, and maintaining a hostile work environment. (Docket #106). Plaintiffs also claim that "[w]hen African American employees of Kodak complain[ed] about" the discriminatory practices and policies to Kodak's management, they were "subjected to retaliation." Id. The amended complaint references and relies upon multiple "Letters of Determination" issued by the Equal Employment Opportunity Commission (EEOC) on February 6, 2004 and thereafter, which found, *inter alia,* that: (1) weekly pay rates for

white employees of Kodak were consistently higher than weekly pay rates for black employees; (2) Kodak maintained a hostile work environment with respect to its African American employees; and (3) Kodak retaliated against African American employees who participated in protected activities. See Amended Complaint at ¶ 50-51.  Plaintiffs seek to represent a class consisting of present, former and future African American Kodak employees in the United States.

Pending before the Court is Kodak's renewed motion for summary judgment with respect to three individual plaintiffs (Olin Singletary, Gladys Alston and Carrie Rice), all of whom are former employees of Kodak.  At the time of their separation from Kodak, all three executed releases which, according to Kodak, released Kodak from the very race discrimination claims they now pursue in the instant litigation.  For their part, the three plaintiffs dispute the validity of the releases and demand further discovery to support their invalidity contentions.

The enforceability of the releases signed by Singletary, Alston and Rice was first raised in 2005 as part of Kodak's pre-answer motion to dismiss.  Because matters outside the pleadings were submitted with respect to the release issue, the Court converted that aspect of Kodak's motion into a motion for summary judgment pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.  Although this initial motion was denied, the Court

2

stated that the viability of the releases "seems to be an issue that could be decided early in the litigation and without the need for extensive discovery." Employees Committed For Justice v. Eastman Kodak Company, 407 F.Supp.2d 423, 437 (W.D.N.Y. 2005).   In effect, the Court encouraged Kodak to renew the motion once discovery relevant to the validity of the releases had been completed. Id.   Kodak now renews its motion with respect to the releases signed by Singletary, Alston and Rice.

## Relevant Facts

The Termination Assistance Plan: Kodak procured the releases at issue here as part of a benefit plan known as Kodak's Termination Assistance Plan or "TAP".   Under TAP, Kodak agrees to provide benefits to eligible employees whose employment is terminated for a period expected to last more than thirty (30) days as a result of various employment decisions including lay-offs, reductions in force (RIF) initiatives, plant closures or department eliminations. See Benefit Plan, annexed as Exhibit "A" to Affidavit of Rita Metras (Docket #116).   The TAP program was initiated by Kodak in 1971 and has been periodically revised. See Deposition of Rita Metras at page 47, annexed as Exhibit "3" to Declaration of Stephen A. Whinston (Docket #135).

The TAP plan is a benefit program subject to ERISA.   The plan (hereinafter referred to as the "TAP Plan" or "TAP") itself is

3

contained in a 24-page document. <u>See</u> Metras Aff., Exhibit "A" (Docket #116). A summary of the TAP plan is also set forth in Kodak's employee handbook entitled "You and Kodak." <u>See</u> Metras Aff., Exhibit "B". Once accepted into TAP, employees are paid three types of severance benefits: (1) Termination Allowance Benefits which consist of a continuation of pay for a specified number of weeks based on the employee's length of service with Kodak; (2) a Retraining Allowance not to exceed $5,000.00; and (3) Outplacement Counseling Services provided by a third party vendor, the duration of which is determined by the employee's wage grade.

Beginning in 1997, TAP was revised by Kodak to require general employees (which would include Singletary, Alston and Rice) to sign a "waiver, release and covenant not to sue" Kodak as a condition of receiving TAP benefits. <u>See</u> Metras Dep. Tr. at pages 104-07; TAP Plan at page 8; Kodak Employee Handbook at page 231. The relevant release is broadly worded and is part of a six-page document entitled "Agreement, Waiver and Release." <u>See</u> Metras Aff., Exhibit "C" (Docket #116). The terms of the "Agreement, Waiver and Release" inform the employee that: (1) it is a contract between the employee and Kodak; (2) the payment of "severance benefits" is contingent on Kodak's approval of the employee's election to participate in TAP, which approval Kodak may withhold depending on any participation cap Kodak establishes in relation to the number of employees electing to participate; (3) the employee is

4

"encouraged" to consult with "an attorney of your choice concerning the agreement" before signing it; (4) that Kodak will allow the employee "at least 45 days" to review the agreement and, if the employee chooses to sign the agreement in fewer than 45 days, the employee "acknowledge[s] such decision was entirely voluntary" and (5) that even after the Agreement has been signed, the employee retains "the right to revoke [the] Agreement within 7 days [after] signing it." Id.

When Kodak decided to initiate a layoff or downsizing initiative it would send to eligible employees a "package of documents" which would include a cover letter announcing the particular program and its eligibility requirements, an election form to be completed by the employee to confirm their decision to seek TAP benefits and a booklet entitled "Your Kodak Voluntary Separation Package." See Affidavit of Judy Rolwing, ¶ 3-4 (Docket #165). The booklet contains several references to the release requirement and repeatedly informs the employee that in order to receive TAP benefits, the employee must execute the release enclosed with the package of materials. Id.

As to the language of the actual release, the Agreement iteself provides:

> In consideration for the Severance Benefits, you hereby release and discharge Kodak, its parent corporations, subsidiaries, affiliates, successors and assigns and their respective directors, officers, employees and agents (hereinafter collectively referred to as the

> "Releasees"), both individually and in their
> official capacity, from all claims, actions and
> causes of action of any kind, which you, or
> your agents, executors, heirs, or assigns ever
> had, now have, or may have, whether known or
> unknown, as a result of your employment by or
> termination of employment from Kodak.

See Metras Aff., Exhibit "C" at page 2.

The release goes on to specify certain claims as being within the scope of the release, including the employee's right to sue under "any federal, state or local law, regulation or executive order prohibiting discrimination" including Title VII of the Civil Rights Act of 1964. The consideration supporting the release is described in the Agreement as "severance benefits." Id.

The Agreement also sets forth certain specified claims that are not waived by signing the agreement, including those for accrued retirement benefits, accrued vacation benefits and benefits the employee is entitled to under any "Company health care, dental or life insurance plan." Id. at page 3. Later versions of the Agreement further provide that if any part of the Agreement, including the waiver of claims section, is found by a court to be "illegal, void or unenforceable" the employee agrees to "execute a second release that is legal and enforceable, without further consideration, payments or compensation." See Metras Aff. Exhibit "D" at page 5.

Singletary, Alston and Rice: The plaintiffs against whom Kodak seeks summary judgment all elected to participate in TAP.

6

Singletary signed the Agreement containing the release on October 30, 2001.   Singletary thereafter accepted $41,200.00 in TAP severance payments.   Alston signed the Agreement containing the release on March 7, 2002 and thereafter accepted $30,222.00 in TAP severance payments.   Rice signed the Agreement containing the release on October 14, 2003 and thereafter accepted $36,660.00 in TAP severance payments.   All three releases contain the following bolded language immediately above the employee's signature line:

> **YOU HAVE CAREFULLY READ AND FULLY UNDERSTAND ALL THE PROVISIONS OF THIS AGREEMENT, AND ARE ENTERING INTO THIS AGREEMENT VOLUNTARILY.  YOU ACKNOWLEDGE THAT THE CONSIDERATION YOU ARE RECEIVING IN EXCHANGE FOR EXECUTING THIS AGREEMENT IS GREATER THAN THAT WHICH YOU WOULD BE ENTITLED TO IN THE ABSENCE OF THIS AGREEMENT.   YOU HAVE NOT RELIED UPON ANY REPRESENTATION OR STATEMENT, WRITTEN OR ORAL, NOT SET FORTH IN THIS AGREEMENT.**

Id. At the time Alston and Rice signed their releases, both had already filed a charge of race discrimination against Kodak with the EEOC.  See Affidavit of Gladys Alston at ¶ 8 and Affidavit of Carrie Rice at ¶ 10, annexed as Exhibits "3" and "4" to Plaintiffs' Statement of Facts ("SOF")(Docket #135).   Singletary did not file his claim of discrimination with the EEOC until August 2002, ten months after he signed the release.   See Affidavit of Olin Singletary at ¶ 22, annexed as Exhibit "2" to Plaintiffs' SOF.

In opposing summary judgment, Singletary, Alston and Rice do not deny making the election to participate in TAP, receiving the

written description of the TAP documents and the employee handbooks containing the description of TAP, or signing the Agreement which contained the "Agreement, Waiver and Release" provisions.  Rather, in affidavits submitted to the Court, Singletary, Alston and Rice urge that there are issues of fact as to the circumstances surrounding the signing of the releases and the underlying consideration which precludes the granting of summary judgment against them.  Their affidavits claim that the releases were not fully and properly explained to them, that material and fraudulent oral misrepresentations were made to them by Kodak officials inducing them to sign the Agreement, that the agreements were presented in a coercive work environment without sufficient time or counsel to make an informed decision and that the releases were the product of economic coercion and duress.  Both Alston and Rice aver that they had "no idea that by signing the Agreement, Waiver and Release, I was dismissing my previously filed and pending EEOC Charge of Discrimination."  See Alston Aff. at ¶ 20; Rice Aff. at ¶ 26.  All three plaintiffs also claim that there exist material factual issues as to whether their releases are void because the releases are not supported by adequate consideration.[1]

---

[1]  In opposing the initial motion for summary judgment made by Kodak on the release issue, counsel for plaintiff was pressed by this Court as to whether the adequacy of the consideration was the "only basis" for Singletary, Alston and Rice's arguments that the releases were invalid. See Affirmation of Steven Carling, Esq., Exhibit "C" at page 40 (Docket #116).  Although counsel seemed to indicate that consideration was the only disputed issue upon which additional discovery was needed, the motion papers filed in opposition to Kodak's renewed summary judgment motion

## Discussion

The general principles used to evaluate the merits of summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is warranted where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, all ambiguities and inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1995). While the burden of showing that no genuine factual dispute exists is on the defendant, when faced with a properly supported summary judgment motion, plaintiff must "come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Such a showing "is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants." United States v. Potamkin Cadillac Corp., 689 F.2d 379, 381 (2d Cir. 1982)(internal citation omitted). Finally, "the mere existence of factual issues – where those issues are not material

---

raise many more grounds for claiming Singletary, Alston and Rice are not bound by the releases they executed.

to the claims before the court – will not suffice to defeat a motion for summary judgment." <u>Quarles v. General Motors Corp.</u>, 758 F.2d 839, 840 (2d Cir. 1985).

In evaluating the merits of a summary judgment motion in the context of a discrimination claim, courts must be cautious in granting the relief where the conduct at issue "requires an assessment of individuals' motivations and state of mind" because juries have "special advantages over judges in this area." <u>Brown v. Henderson</u>, 257 F.3d at 251. Nevertheless, "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985). "[S]ummary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 40 (2d Cir. 1994). <u>See</u> <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001)("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

<u>Releasing Claims Under Title VII</u>: Knowing and voluntary agreements to settle cases, including cases initiated under federal discrimination laws with broad remedial purposes like Title VII, are favored by courts and, once executed, should not be subject to easy invalidation. <u>Carson v. American Brands, Inc.</u>, 450 U.S. 79, 88 n.14

(1981)("[i]n enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims"); <u>Wright v. Eastman Kodak Company</u>, 445 F.Supp.2d 314, 317 (W.D.N.Y. 2006)(it is "well settled that stipulations of settlement are favored by the courts, and are not lightly cast aside")(internal quotation and citation omitted).[2]

<u>Knowing and Voluntary Test</u>: Whether obtained in connection with a specific employment dispute, or, more generally as part of an enhanced benefit or separation pay program, there are several factors a court must consider in evaluating whether to enforce a waiver or release of Title VII claims.  To be effective, a waiver of an employee's Title VII claims must be knowing and voluntary. The Second Circuit is one of several circuits to adopt a "totality of circumstances test" in evaluating the knowing and voluntary standard.  <u>Bormann v. AT&T Communications, Inc.</u>, 875 F.2d 399, 403 (2d Cir. 1989).  In <u>Bormann</u>, the Second Circuit delineated several factors courts should consider in deciding whether, under the totality of circumstances, a waiver of Title VII discrimination claims was made knowingly and voluntarily.  The relevant factors

---

[2] It is also proper for an employer like Kodak to seek and obtain a waiver or release of claims pursuant to a benefit program subject to ERISA.  In <u>Lockheed Corp. v. Spink</u>, 517 U.S. 882, 894 (1996), the Supreme Court found no violation of ERISA where the employer offered retirement incentives conditioned upon the employee executing a release of employment related claims.  The Court held: "[I]f an employer can avoid litigation that might result from laying off an employee by enticing him to retire early . . . it stands to reason that the employer can also protect itself from suits arising out of that retirement by asking the employee to release any employment-related claims he may have." <u>Id.</u> at 894-95.

include:  (1) the plaintiff's education and business experience; (2) the amount of time the plaintiff had possession of or access to the release before signing it; (3) the plaintiff's role in deciding the terms of the release; (4) the clarity of the release; (5) whether the plaintiff was represented by or consulted an attorney; (6) whether the consideration given in exchange for the employee's waiver exceeds benefits to which the employee was already entitled by contract or law; (7) whether the employer encouraged the employee to consult an attorney; and (8) whether the employee had a fair opportunity to do so.   These factors are not exhaustive, and all need not be satisfied for a release to be deemed enforceable.  <u>Id.</u> at 403.  While the "knowing and voluntary" benchmark necessary for releasing Title VII claims is well established, application of the standard by various courts and circuits has been criticized as inconsistent and sometimes contradictory. <u>See</u> Daniel P. O'Gorman, <u>A State of Disarray: The "Knowing and Voluntary" Standard for Releasing Claims Under Title VII of the Civil Rights Act of 1964</u>, 8 U. Pa. J. Labor and Employment Law 73 (2005).

<u>Ratification and Tender-Back</u>:  In addition to examining the totality of circumstances to decide whether a particular release or waiver is knowing and voluntary, courts within the Second Circuit have also applied the doctrines of ratification and tender-back in determining whether a release is voidable.   Though factually related, and thus often lumped together for analytical purposes, the

rules of ratification and tender-back can represent distinct hurdles to employees seeking to avoid the consequences of a release.

   Ratification:   As referenced above, a release must be knowing and voluntary in order to be valid.   Where the totality of circumstances surrounding how the release was obtained demonstrates that it was not a knowing and voluntary decision because of duress, coercion or fraudulent misrepresentations by the employer, the release is not void, but voidable.   The distinction between a void release and a voidable release is important.   Where a release is voidable, once the employee is cognizant of the alleged defect and has a reasonable opportunity to reject or challenge the release, the employee's subsequent decision to keep the consideration despite the defect operates to ratify the release.   "A voidable waiver and release can still be enforced if it is ratified by the employee." Wittorf v. Shell Oil Company, 37 F.3d 1151, 1154 (5th Cir. 1994)(summary judgment granted where employee chose to retain enhanced severance benefits paid to him in consideration for his promise not to file claims against his employer).[3]   Ratification

---

   [3] The plaintiff in Wittorf was terminated from his employment as part of a reduction in force.   After signing a release in exchange for enhanced severance benefits, the plaintiff in Wittorf brought a lawsuit alleging disability discrimination and age discrimination under the ADEA. Although the court found that Wittorf had ratified the release when he "chose to retain and not tender back the enhanced severance benefits" (Wittorf, 37 F.3d at 1154), this decision predated the Supreme Court's holding in Oubre v. Entergy Operations, Inc., 522 U.S. 422, 428 (1998), that plaintiffs are not required to tender-back consideration before bringing claims under the Older Workers Benefit Protection Act ("OWBPA"). See infra note 5.

occurs "at the point that a party learns that his prior agreement
not to sue is voidable but continues to accept the benefits of that
agreement." Livingston v. Bev-Pak, Inc., 112 F.Supp.2d 242, 249
(N.D.N.Y. 2000).  "Numerous federal courts hold that by accepting
and retaining the benefits of a voidable release, a party ratifies
the release and cannot avoid its obligations." Aikins v. Tosco
Refining Co., 1999 WL 179686, *6 (N.D. Cal. March 26, 1999)(although
acceptance    of    severance    benefits    supported    a    finding    of
ratification, summary judgment denied because employee's attempt to
rescind the release soon after cashing check created an issue of
fact).  See, e.g., Reid v. IBM Corporation, 1997 WL 357969, *6
(S.D.N.Y. June 26, 1997)(by accepting and keeping severance benefits
after the alleged duress, incapacitation and undue influence was
removed, employee-plaintiff ratified the release and could not
pursue Title VII claim); Dorn v. Astra USA, 975 F.Supp. 388, 393-94
(D. Mass. 1997)(even if there were coercion or duress in obtaining
general releases from terminated employees, plaintiffs ratified the
agreements and waived right to assert defenses by accepting benefits
and waiting between 11 and 34 months to disavow agreements and sue
for sexual harassment).

Tender Back Doctrine: Although related to the ratification
doctrine, the tender back doctrine concerns actions the employee-
plaintiff must take before filing suit.  "The tender back doctrine
requires, as a condition precedent to suit, that a plaintiff return

the consideration received in exchange for a release, on the theory that it is inconsistent to bring suit against the defendant while at the same time retaining the consideration received in exchange for a promise <u>not</u> to bring such a suit." <u>Oubre v. Entergy Operations, Inc.</u>, 522 U.S. 422, 436-437 (1998)(Thomas, J. dissenting)(emphasis in original). The tender back doctrine does not preclude a suit, but "merely puts the employee to a choice between avoiding the release and retaining the benefit of his bargain." <u>Id.</u> at 439. Thus, under the tender back doctrine, an employee who obtains extra severance benefits in exchange for a release in favor of the employer must tender the extra benefits back to the employer as a condition precedent to challenging the validity of the release. "The tender back doctrine operates not to make the voidable release binding, as does ratification, but rather precludes a party from simultaneously retaining the benefits of the release and suing to vindicate released claims." <u>Id.</u> at 440. See <u>Fleming v. United States Postal Service</u>, 27 F.3d 259, 261-62 (7th Cir. 1994)(employee who agreed to settle her Title VII action could not seek to rescind release without first tendering or offering to tender consideration received); <u>Williams v. Phillips Petroleum Co.</u>, 23 F.3d 930, 937 (5th Cir. 1994)("[a] person who signs a release, then sues his or her employer for matters covered under the release, is obligated to return the consideration"); <u>Bittinger v. Tecumseh Products Co.</u>, 83 F.Supp.2d 851, 871 (E.D. Mich. 1998)("the tender

of consideration is a prerequisite to plaintiff's maintenance of a claim challenging the validity of a release in a non-ADEA context").

Ratification and Tender Back in Title VII cases: Although there has been disagreement among courts as to whether the ratification and/or tender back doctrine should be applied in the context of a plaintiff-employee seeking to enforce Title VII rights,[4] courts within the Second Circuit have applied both doctrines in Title VII cases. In Tung v. Texaco, 32 F.Supp.2d 115 (S.D.N.Y. 1997), plaintiff Tung, who had worked for Texaco for fourteen years, was notified that he was being terminated as part of a company-wide reduction in force. Thereafter, Tung was offered an "enhanced" benefit package in return for agreeing to release his employer from any and all claims, including all employment discrimination claims, arising in connection with his employment. Tung signed the release and received over $46,000.00 in enhanced severance benefits. Tung subsequently filed a charge of discrimination with the EEOC alleging both race and age discrimination. Texaco moved to dismiss and the district court converted the motion into one for summary judgment. Applying the

---

[4]   In some reported decisions, courts have determined that enforcing the ratification and tender back doctrines defeat the remedial purposes of federal civil rights statutes.  See, e.g., Cole v. Gaming Entertainment, L.L.C., 199 F.Supp.2d 208, 215-217 (D. Del. 2002)(under facts presented, employee was not required to tender back monetary consideration before commencing Title VII action); Rangel v. El Paso Natural Gas Company, 996 F.Supp 1093, 1099 (D. N.M. 1998)(tender back doctrine did not require employee to return severance pay before filing Title VII lawsuit, but could constitute an offset to any recovery).

Bormann factors, the district court granted summary judgment in favor of Texaco.   As to the enhanced severance benefits paid to Tung, the court stated: "[A] plaintiff who accepts and neither returns nor offers to return the consideration he or she has received for consideration for executing a release, is deemed to have ratified the Release and is thereby barred from challenging its validity."   Id. at 118.   The fact that Tung was willing to repay the consideration should the court uphold the validity of the release was of no moment.   "This [offer to repay] is by no means an unconditional tender and occurs too late to undo the ratification resulting from acceptance and retention of the severance payments." Id.   On appeal, the Second Circuit affirmed the dismissal of Tung's Title VII claims[5] "substantially for the reasons stated in the district court's opinion."   Tung v. Texaco, 150 F.3d 206, 208 (2nd Cir. 1998).

Similarly, in Reid v. IBM Corporation, 1997 WL 357969 (S.D.N.Y. June 26, 1997), the plaintiff enrolled in an early retirement program that paid enhanced severance benefits to eligible employees in return for a release of all claims related to plaintiff's

---

[5]   After the district court's decision in Tung, the Supreme Court decided Oubre v. Entergy Operations Inc., 522 U.S. 422 (1998).   In Oubre, the Court held that a release that does not conform to the specific statutory requirements of the Older Workers Benefit Protection Act (OWBPA) does not bar an age discrimination claim under the ADEA and the employer may not "invoke the employer's failure to tender back as a way of excusing its own failure to comply" with the OWBPA.   Id. at 427-28.   Accordingly, while Tung's Title VII claims were dismissed, he was allowed to proceed with his ADEA claims based on the Oubre holding.

employment with IBM, including Title VII claims. After signing the release and receiving $28,000.00 in enhanced severance benefits, plaintiff filed employment discrimination claims with the EEOC. In granting IBM's motion for summary judgment, the court addressed, *inter alia*, the ratification and tender back doctrines as applied to plaintiff's allegation that the release was procured as a result of economic duress, undue influence and plaintiff's own mental incapacity:

> Here, it is undisputed that plaintiff never tendered back or returned the $28,000 in severance pay he received in consideration for the Release. (Reid dep. at 34) Plaintiff does not allege that he continued to suffer from the same undue influence, duress, mental disability or intoxication after July 1993, or that these factors continued to impair his ability to act reasonably. Therefore, by accepting the benefits of the transaction even after the alleged undue influence, duress, or incapacity was removed, and by failing to tender back the consideration, plaintiff has acquiesced to the terms of the Release and ratified it.

Id. at *11.

In Livingston v. Bev-Pak, Inc., 112 F.Supp.2d 242 (N.D.N.Y. 2000), the plaintiff was going to be terminated from his employment after filing charges of discrimination with the EEOC. His employer offered plaintiff $10,000.00 if he would resign and "drop" the EEOC charges. Plaintiff agreed and signed a release in favor of his employer. Thereafter, plaintiff filed a Title VII race discrimination suit against his former employer and claimed his release was signed under duress and that he was mentally

incapacitated at the time he resigned and executed the release.  In granting the employer's motion for summary judgment, the court applied the doctrines of ratification and tender back.  The court found that "even if Plaintiff did not knowingly and voluntarily execute the release agreement, he has since ratified the agreement by inaction."  Id. at 249.  With respect to the tender back doctrine, the court held that a "key element" of ratification "is the failure of the plaintiff to tender back the consideration that he received in exchange for executing the release."  Id.  Because plaintiff "has neither tendered back, nor offered to tender back the $10,000 that he received in consideration for signing the release agreement," he was barred from bringing his federal Title VII claims.  Id. at 249.

The tender back requirement was again applied to a Title VII claim in Cheung v. New York Palace Hotel, 2005 WL 2387573 (E.D.N.Y. Sept. 28, 2005).  The plaintiff in Cheung was an African American woman who was terminated from her position after sixteen years of service.  After her termination, plaintiff signed a severance agreement in which she agreed to release any and all potential claims against the defendant, including Title VII claims, relating to her termination.  In return for the release, plaintiff was paid over $80,000.00.  Id. at *1.  Ten months later, plaintiff filed a race discrimination claim with the EEOC and thereafter a lawsuit claiming race-based discrimination.  Invoking the release, the

19

employer moved to dismiss the complaint. Relying on the Second Circuit's decision in Tung, the court found the "rule requiring the return of consideration before a contractual release may be rescinded is controlling" and dismissed plaintiff's Title VII claims. Id. at *4. The court stated: "[I]t is undisputed that plaintiff has failed to tender back the consideration she received for releasing her claims nor has she made such an offer. Therefore, plaintiff cannot rescind the Agreement and her Title VII claims are consequently barred." Id. at *4.

Finally, and most recently, this court applied the ratification and tender back rules in a case in which the plaintiffs could have been members of the putative class in the instant litigation. In Wright v. Eastman Kodak Company, 445 F.Supp.2d 314 (W.D.N.Y.)(Larimer, J.), this court held that releases signed by two Kodak employees seeking to assert Title VII race discrimination claims were valid despite their claim that the releases were procured through fraud and duress. In granting Kodak's motion for summary judgment, Judge Larimer held:

> Plaintiffs in this case do not deny that they accepted and retained the monies that Kodak paid to them pursuant to the releases. There is no hint in the record that they have repudiated those releases or attempted to return the money (as the settlement agreements themselves provided they would in the event that plaintiffs sued Kodak). Plaintiffs cannot have it both ways: enjoying the substantial monetary benefits that Kodak agreed to give them as consideration for the releases, but then asking that they be excused from living up

> <u>to their end of the bargain by honoring those</u>
> <u>releases</u>.

<u>Wright</u>, 445 F.Supp.2d at 320 (emphasis added).

<u>Application of Ratification and Tender Back Rules</u>: Application of the ratification and tender back doctrines to the undisputed facts presented here is straightforward.  As in <u>Wright</u>, there is no dispute in this record that Singletary, Alston and Rice accepted and retained the TAP severance benefits Kodak paid them when their employment with Kodak ended.  As in <u>Wright</u>, there is no genuine dispute in this record that prior to commencing this litigation they did not return and still not have not offered to return the TAP payments they received from Kodak in exchange for the release of their Title VII claims.  Any evidence to support timely renunciation of the release or any offer to return their TAP benefits is uniquely within the knowledge of the plaintiffs and further discovery on this issue is not needed.  <u>See Alpert's Newspaper Delivery Inc. v. New York Times Co.</u>, 1988 WL 95146, *11 (E.D.N.Y. Aug. 26, 1988)(court rejected plaintiffs' Rule 56(f) affidavit that they needed more discovery to oppose summary judgment, finding that plaintiffs would be the only parties in possession of the evidence necessary to defeat summary judgment and "discern[ed] no obstacle to the plaintiffs submitting their own affidavits").

Moreover, despite relying on allegations that would require application of the tender back doctrine (duress, fraud, misrepresentations), even after suit was commenced and Kodak moved

to dismiss the complaint based on the signed releases, Singletary, Alston and Rice have still not returned or offered to tender back their TAP benefits.   The ratification doctrine was raised by Kodak in their moving papers[6] and plaintiffs did not address it.   Indeed, after oral argument of the instant motion, Judge Larimer issued his decision in <u>Wright v. Kodak</u> and this Court requested additional briefing on the applicability of the <u>Wright</u> decision to Kodak's motion here.   Kodak's supplemental brief again relied on the ratification and tender back doctrines.   Plaintiffs chose not to address either doctrine in their supplemental brief.

In sum, I find the doctrines of ratification and tender back to be controlling here.   By intentionally retaining the TAP benefits plaintiffs received in exchange for the release, even after they were aware of the alleged defects involved in procuring the release, Singletary, Alston and Rice have ratified the releases they signed. Moreover, their failure at any time to tender back or offer to tender back their TAP benefits precludes them from arguing that the releases are voidable for fraud, duress, or deliberate misrepresentation.   <u>See</u> <u>Kristoferson v. Otis Spunkmeyer, Inc.</u>, 965 F.Supp. 545, 549 (S.D.N.Y. 1997)(historically, at least "an offer to tender back [must be] made coincident with the bringing of the action challenging the underlying contract, to substitute for the

---

[6] <u>See</u> Docket #142 at page 12-13.

actual tender").[7]

Adequate Consideration: The only argument made by plaintiffs that survives application of the ratification and tender back doctrines is their claim that the releases they signed were not supported by adequate consideration. It is beyond cavil that "[a] release is not effective unless the party giving the release receives something of value to which the party was not otherwise entitled." Chaput v. Unisys Corporation, 964 F.2d 1299, 1301 (2nd Cir. 1992). If a release is not supported by adequate consideration, it is void because there is no contract. The doctrines of ratification and tender back thus have no relevance to

---

[7] In Kristoferson, the court held that when the validity of releases signed in the employment context are litigated, there are "competing considerations" that need to be balanced. On the one hand, "a typical employee will already have spent the monies she received in exchange for the release by the time she learns of its voidability." Kristoferson v. Otis Spunkmeyer, Inc., 965 F.Supp. at 548. On the other hand "[t]o enable a plaintiff who has already received substantial consideration for a release to keep that consideration while at the same time bringing the very lawsuit the release was intended to obviate is not only unfair on its face, but is bound to encourage such doubtful litigation." Id. The court devised its own unique approach to make sure neither side gets a "free ride":

> [T]his Court will henceforth require that, before a Title VII plaintiff who has previously received benefits for signing a release from such liability can go forward with such an action, the plaintiff must execute a formal undertaking that requires the plaintiff, if the release is later found to be invalid, to return the consideration to the employer, in an amount (including possible interest) and on a schedule and other terms to be determined by the Court at the conclusion of the case, regardless of whether the plaintiff thereafter prevails on her Title VII claim.

Id. at 549. While this approach is innovative, it has not been suggested by plaintiffs in response to the instant motion, it has not been endorsed by the Second Circuit, and this Court declines to adopt it here.

releases obtained without adequate consideration. "Indeed, if there was no consideration, such consideration could be neither returned nor retained." Id. at 1302.

The issue then is whether the TAP benefits given to Singletary, Alston and Rice in exchange for the their waiver exceeded benefits to which they were already entitled by contract or law. Bormann v. AT&T Communications, Inc., 875 F.2d at 403. There is no dispute that each of the plaintiffs signed an agreement containing the following specific representation: **"YOU ACKNOWLEDGE THAT THE CONSIDERATION YOU ARE RECEIVING IN EXCHANGE FOR EXECUTING THIS AGREEMENT IS GREATER THAN THAT WHICH YOU WOULD BE ENTITLED TO IN THE ABSENCE OF THIS AGREEMENT."** See Metras Aff., Exhibit "D" at page 6 (Docket #116). Moreover, the agreement also sets forth certain specified claims that Singletary, Alston and Rice were not waiving by signing the agreement, including those for accrued retirement benefits, accrued vacation benefits and benefits the employee is entitled to under any "Company health care, dental or life insurance plan." Id. at page 3. Thus, so long as the TAP payments, outplacement counseling or retraining allowance were benefits that plaintiffs would not otherwise be entitled to if they declined to sign the release, there was adequate consideration.

In trying to overcome the plain language of the Agreements they signed, plaintiffs make several arguments regarding the lack of adequate consideration. First, plaintiffs claim that the

consideration was inadequate because Kodak's alleged discriminatory pay practices unfairly reduced the TAP benefits plaintiffs were paid as compared to similarly situated white employees who were paid TAP benefits. Plaintiffs cite no statute, regulation or case supporting this argument and this Court can find none. If plaintiffs' position were correct, any release obtained by an employer that encompassed work related discrimination claims would be rendered ineffective simply upon the employee claiming that the consideration paid in exchange for the release was negatively impacted by past discrimination. This Court declines to establish such a rule.

Second, plaintiffs argue that because Singletary, Alston and Rice began their employment prior to 1997, when these same TAP benefits "flowed automatically to all eligible employees" without the requirement of a signed release, there is an issue of fact as to whether consideration was provided to them for signing the releases. See Declaration of Stephen A. Whinston, Esq. at ¶ 18 (Docket #135). This argument fails because severance benefit plans are not retirement or pension plans under ERISA, they are welfare benefit plans. "[S]everance benefits are unaccrued and unvested, and an employer does not owe its employees a fiduciary duty when it amends or abolishes a severance benefit plan." Tarver v. North American Company for Life and Health Ins., 919 F.Supp. 1128, 1131 (N.D. Ill. 1996)(plaintiff's claim that she should have been considered for older, more favorable severance benefit plan

dismissed because the plan in effect at the time of separation controls). As the Supreme Court has stated, "ERISA does not create any substantive entitlement" to employer-provided welfare benefits. Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995). Rather, employers are "generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." Id. Therefore, it was within Kodak's discretion to modify the TAP plan in 1997 to require a release before dispensing severance benefits, even though it had previously given those benefits without requiring a release. Simply put, at the time of their separation from Kodak, plaintiffs were no longer entitled to the severance benefits that were in effect at the time they were hired and the fact that during their employment Kodak implemented a release requirement does not establish that they received inadequate consideration for that release. See Adams v. Tetley USA, Inc., 363 F.Supp.2d 94, 103-104 (D.Conn. 2005)(court rejected plaintiffs' claim that they were entitled to the benefits of a 1975 plan that was in effect when they began working for defendant because new plan was in effect when they ended their employment).

Third, plaintiffs claim that they did not receive adequate consideration for their releases because another African American employee, Maria Scott, refused to sign the release but still received some of the severance benefits provided by TAP. See Plaintiffs' SOF (Docket #135) at pages 19-21. In her affidavit, Ms.

Scott states that she was represented by counsel when she was presented with her severance package and that her attorneys "assisted [her] in getting additional information" about her TAP benefits.  See Affidavit of Maria Scott ¶ 8, Exhibit #5 to Plaintiffs' SOF (Docket #135).  According to Ms. Scott, based on the advice of counsel, she refused to sign the release, but received a retraining allowance, six months of medical insurance coverage, accumulated vacation pay and cash accumulation.  Id. at ¶ 9-11.  She stated that "[t]he only thing I would not get would be the pay based on tenure with the Company."  Id. at ¶ 9.

Contrary to the inference that the TAP severance pay was minimal, the amounts paid to Singletary, Alston and Rice under this provision of TAP were substantial.  Indeed, plaintiffs received $41,200.00, $30,222.00 and $36,666.00, respectively, amounts that can hardly be couched as nominal or insignificant consideration. Moreover, there is no basis for a finding that Singletary, Alston and Rice would have received these amounts without signing a release.  In fact, Ms. Scott's affidavit only serves to pay tribute to this determination.  See Myricks v. Federal Reserve Bank of Atlanta, ___ F.3d ___, 2007 WL 675341, *6 (11th Cir. March 7, 2007)(consideration paid to other employees not relevant where record confirms Title VII plaintiff received some consideration for signing release in return for enhanced severance package).

The law is clear that as long as an employee receives some

benefit that is greater than what he was already entitled to, there is consideration.  See Wagner v. NutraSweet Co., 95 F.3d 527, 532 (7th Cir. 1996)("[C]onsideration is relatively easy to show.  As long as the person receives something of value in exchange for her own promise or detriment, the courts will not inquire into the adequacy of the consideration").  Singletary, Alston and Rice unquestionably received something of value in exchange for signing the release. Indeed, all three plaintiffs explicitly and specifically acknowledged in writing that they were obtaining enhanced severance benefits greater than what they would have been entitled to in the absence of signing the release.  The record here only confirms that "the consideration given in exchange for the employee's waiver exceeds benefits to which the employee was already entitled by contract or law."  Bormann v. AT&T Communications, Inc., 875 F.2d at 403.  See DiMartino v. City of Hartford, 636 F.Supp. 1241, 1249 (D. Conn. 1986)(release is supported by adequate consideration if employee received "something of value" to which he had no previous right).  Accordingly, plaintiffs federal claims are barred by the releases they signed and Kodak is entitled to summary judgment on those claims.

State Law Claims:  In most instances, where all federal law claims are dismissed in the early stages of a lawsuit, "the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity - will point

toward declining to exercise jurisdiction over the remaining state-law claims." <u>Valencia ex rel. Franco v. Lee</u>, 316 F.3d 299, 305 (2d Cir. 2003). <u>See also</u> <u>Hewitt v. Alcan Aluminum Corp.</u>, 185 F.Supp.2d 183, 191 (N.D.N.Y. 2001)(federal courts "should decline the exercise of pendant jurisdiction" where only state law claims remain). Here, having dismissed the federal discrimination claims of Singletary, Alston and Rice, this Court declines to exercise jurisdiction over their remaining state law claims and hereby dismisses them without prejudice. <u>See</u> <u>Wharton v. Duke Realty, LLP</u>, 467 F.Supp.2d 381, 393 (S.D.N.Y. 2006)(after dismissing plaintiff's federal discrimination claims, court declined to exercise supplemental jurisdiction over her New York State Human Rights Law claims and dismissed them without prejudice so "plaintiff may bring these claims in the New York State Supreme Court"); <u>Dempsey v. Town of Brighton</u>, 749 F.Supp. 1215, 1230 (W.D.N.Y. 1990)(pendent state law claims dismissed when summary judgment granted against plaintiff on alleged civil rights violations). Further, plaintiffs did not allege diversity jurisdiction in their third amended complaint pursuant to 28 U.S.C. § 1332 and based on the allegations in the complaint, complete diversity of citizenship between the parties is lacking. Therefore, this Court lacks subject matter jurisdiction over plaintiffs' state law claims. <u>See</u> <u>Pollock v. Chertoff</u>, 361 F.Supp.2d 126, 136 (W.D.N.Y. 2005).

## **Conclusion**

For the reasons set forth above, Kodak's motion for summary judgment (Docket #116) is **granted**.


**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:    March **29**, 2007
          Rochester, New York