**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

COURTNEY DAVIS, *et al.*,
individually and on behalf of
all others similarly situated,

        Plaintiff(s),

    v.

EASTMAN KODAK COMPANY,

        Defendant(s).

_____

GLADYS ALSTON, *et al.*, on behalf
of themselves and others similarly
situated,
        Plaintiff(s),

    v.

EASTMAN KODAK COMPANY,

        Defendant(s).

_____

DECISION AND ORDER
04-CV-6098Fe

DECISION AND ORDER
07-CV-6512L

UNITED STATES DISTRICT COURT
FILED
SEP 3 2010
MICHAEL J. ROEMER, CLERK
WESTERN DISTRICT OF NY

## Preliminary Statement

On November 12, 2003, plaintiff Courtney Davis filed a handwritten pro se complaint in the United States District Court for the Northern District of California alleging that she was discriminated against by her employer, defendant Eastman Kodak Company ("Kodak"). Now, almost seven years later, what Courtney Davis commenced as a single plaintiff pro se lawsuit is before this Court as a nationwide class action in which a putative class of over three thousand current and former African American Kodak employees, with Courtney Davis as lead plaintiff, seek final

approval of a class wide settlement that provides both monetary and injunctive relief.

For the past six years this Court has presided over this hard fought litigation.  I am fully familiar with the claims presented, the defenses asserted, the damages allegedly suffered and the factual and legal risks presented to both plaintiffs and Kodak in continuing to litigate the case to conclusion.   For the reasons set forth below, the motions for final approval of the settlement (Dockets ## 321, 324) are granted, except that the service awards are reduced to $50,000 for each named plaintiff.

### Background of the Litigation

On November 12, 2003, plaintiff Courtney Davis filed this case as the sole plaintiff in the United States District Court for the Northern District of California.  See Complaint attached to Docket # 16.  On March 1, 2004, United States Magistrate Judge Joseph C. Spero ordered that this action be transferred to the United States District Court for the Western District of New York.  See Order dated March 1, 2004 attached to Docket # 16.  On March 10, 2004, this action was transferred to the Western District of New York's Rochester Division from the Northern District of California. (Docket # 16).  On April 7, 2004, based on the parties' prior consent to magistrate judge jurisdiction pursuant to 28 U.S.C. §

2

636(c), the Honorable Charles J. Siragusa transferred the litigation to the undersigned for all matters. <u>See</u> Order dated April 7, 2004 (Docket # 21).

On July 30, 2004, plaintiffs filed a First Amended Complaint asserting claims on behalf of the following named plaintiffs: (1) Employees Committed for Justice ("ECJ"), an organization of past and current African American employees of defendant Kodak; (2) Gladys Alston; (3) Courtney Davis (original plaintiff); (4) Cynthia Gayden; (5) Robert Gibson; (6) Jannie Nesmith; (7) Noralean Pringle; (8) Carrie Rice; (9) Maria Scott; (10) Olin Singletary; and (11) Edna Williams. <u>See</u> Amended Complaint (Docket # 29). Plaintiffs subsequently filed a Second Amended Complaint on October 7, 2005 (Docket # 77), and a Third Amended Complaint on March 1, 2006 (Docket # 106). In their Third Amended Complaint, plaintiffs assert that they "bring this action as representatives of a class of all past, current and future African American employees of Kodak." <u>See</u> Third Amended Complaint (Docket # 106) at ¶ 1.

The substance of plaintiffs' allegations against Kodak have been previously set forth in several opinions of this Court issued at various junctures of the litigation[1] and will not be repeated at

---

[1] See in particular <u>Employees Committed For Justice v. Eastman Kodak Co.</u>, 407 F. Supp. 2d 423 (W.D.N.Y. 2005) and <u>Davis v. Eastman Kodak Co.</u>, No. 04-CV-6098, 2007 WL 952042 (W.D.N.Y. Mar. 29, 2007).

length here.  Suffice it to say that plaintiffs claim that Kodak "engaged in an ongoing pattern and practice of discrimination against its African American employees."   Id. at ¶ 3. Specifically, plaintiffs allege (i) discrimination in compensation, (ii) discrimination in promotions, (iii) discrimination in wage classifications and job assignments, (iv) harassment/hostile work environment, and (v) retaliation.   Id.  Plaintiffs assert three causes of action against defendant, including claims for violations of (1) Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., (2) The Civil Rights Act of 1866, 42 U.S.C. § 1981, and (3) The New York Human Rights Law, 15 N.Y. Executive Law §§ 291 et seq.  See id. at ¶¶ 174-187.  Plaintiffs seek class-wide injunctive relief, compensatory damages and punitive damages.

Throughout the litigation, Kodak has vigorously contested the merits of both the individual and class claims asserted by plaintiffs.  Numerous motions have been filed and hearings held, including motions raising unique and complex legal issues.  The interest of the plaintiffs and presumably the putative class in the litigation has remained high.  At almost every court appearance the large courtrooms in our federal courthouse have been filled to capacity and individuals interested in attending the proceedings have on occasion been turned away because of lack of seating space.

On March 29, 2007, this Court issued a decision granting Kodak's motion for summary judgment with respect to three individual plaintiffs who, prior to their separation from Kodak, had executed releases. The releases were obtained as part of Kodak's Termination Assistance Plan (or "TAP") in which a terminated employee could obtain enhanced severance benefits in exchange for releasing Kodak from all claims, actions and causes of action of any kind including any federal, state or local law, regulation or executive order prohibiting discrimination. Although the three plaintiffs (Gladys Alston, Carrie Rice, and Olin Singletary) contested the validity of the releases, the Court applied the doctrines of tender back and ratification and found the releases to be valid and enforceable. The Court held: "I find the doctrines of ratification and tender back to be controlling here. By intentionally retaining the TAP benefits plaintiffs received in exchange for the release, even after they were aware of the alleged defects involved in procuring the release, Singletary, Alston and Rice have ratified the releases they signed. Moreover, their failure at any time to tender back or offer to tender back their TAP benefits precludes them from arguing that the releases are voidable for fraud, duress, or deliberate misrepresentation." Davis v. Eastman Kodak Co., No. 04-CV-6098, 2007 WL 952042, at *9 (W.D.N.Y. Mar. 29, 2007).

5

Although the Court's decision as to the TAP releases referenced only three named plaintiffs, almost forty percent of the potential class members had signed TAP releases and hence my decision impacted the viability of the federal claims of over eleven hundred putative class members.   Accordingly, in a supplemental decision issued on July 19, 2007 (Docket # 253), this Court granted plaintiff's application for entry of a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure which paved the way for immediate appellate review of my decision enforcing the TAP releases.   The following day, July 20, 2007, plaintiff served their motion for class certification, and on February 5, 2008, Kodak served its opposition to the motion for class certification.   Once the class certification motions were served, disputes over the disclosures made in support of expert opinions arose which required additional hearings and determinations by the Court.

Meanwhile, as a direct result of my decision enforcing the TAP releases, and while the appeal of that decision was being prosecuted in the Second Circuit Court of Appeals, plaintiffs filed a second class action lawsuit in New York State Supreme Court.   In granting summary judgment to Kodak on the TAP release issue the Court declined to exercise supplemental jurisdiction over plaintiffs' state law claims.   <u>Davis v. Eastman Kodak Co.</u>, 2007 WL

6

952042, at *12.  Thus, on September 27, 2007, plaintiffs Alston,
Rice and a third individual, Thomas Gainey, pursued their state law
claims and filed a class action race discrimination suit in New
York State Supreme Court.  In their state court lawsuit, plaintiffs
sought to represent a putative class of African American former
employees of Kodak who had signed releases that arguably
encompassed the claims plaintiffs were pursuing against Kodak.  One
of the claims asserted in the state court action was for common law
fraud.  More particularly, plaintiffs and the class they sought to
represent alleged that they were fraudulently induced into signing
releases in violation of New York law.  On October 17, 2007, Kodak
responded to the state court action by removing the lawsuit to
federal court.  See Case # 07-cv-6512 at Docket # 1.  According to
Kodak, the fraud claims asserted in the state lawsuit were directly
related to the administration of an ERISA regulated employee
benefit plan and thus were completely preempted by ERISA.  Once
removed, plaintiffs filed a motion to remand the case back to New
York State Supreme Court.  See id. at Docket # 7.

The motion to remand was referred to this Court by Judge
Larimer for a Report and Recommendation.  On September 24, 2008, I
issued a Report and Recommendation (see id. at Docket # 18)
recommending that plaintiffs' motion to remand should be granted.
Kodak filed objections (see id. at Docket # 19) to my Report and

7

Recommendation that have been stayed pending determination of the instant motion to approve the settlement in these two related class action lawsuits.[2]

### Settlement Negotiations

One need only look at the Court's docket to substantiate the determination of all parties to aggressively litigate this case on the merits.  The litigation, handled by experienced lawyers, was professional but nonetheless extremely hard fought.  Judicial intervention and supervision was necessary throughout the litigation, not only in terms of deciding contested motions and applications, but also by my participation in numerous chamber conferences, telephone conferences and review of letter applications and requests.  Hundreds of thousands of documents were exchanged during the discovery phase, 56 depositions were conducted that took 76 days to complete.

In February 2008, after plaintiffs and Kodak had served their briefs as to class certification and the risks associated with defending and prosecuting the action necessarily became more concrete, the parties began settlement negotiations.  To assist in and provide structure during the negotiations, the parties engaged

---

[2] The parties have consented to the jurisdiction of a magistrate judge for the limited purposes of determining whether to approve the settlement in <u>Alston v. Eastman Kodak Co.</u>, 07-cv-6512 (W.D.N.Y.) (Docket # 24).

Eric D. Green, Esq., an experienced mediator, law professor and founder of Resolutions, LLC.  The settlement negotiations continued over many months and encompassed discussions as to both monetary and equitable relief.  Numerous in-person meetings and conference calls were convened in an effort to negotiate and finalize a complete settlement agreement.  On April 17, 2009, the parties reached agreement on the terms of a complete settlement.

The Settlement Terms: The Settlement Agreement (Docket # 313) provides monetary relief for every member of the Class who did not exclude themselves from the Settlement following their receipt of the Notice by returning an opt-out letter to the Claims Administrator.  The Agreement provides for the payment of $21,376,500.00 (the "Settlement Fund").  Pursuant to the Settlement Agreement, the Settlement Fund will be distributed to the 3008 Class Members who did not timely opt-out of participating in the Settlement.  The Settlement Agreement proposes the following distribution of the settlement funds:

1.   The amount of $9,655,500.00 shall be paid to the Class members as follows:

a.   Category A: for each Class member who signed a release of claims in connection with Kodak's TAP program, he/she shall each receive $1,000.00. There are 1180 Settlement Class Members in this

9

category.   The total amount allocated for this group is $1,180,000.00.

b.   <u>Category B</u>: for each Class member who executed an ADR release but not a TAP release, he/she shall each receive $2,250.00.   There are 79 Class Members in this category.   The total amount allocated for this group is $177,750.00.

c.   <u>Category C</u>: for each Class member who did not execute either a TAP or ADR release, and who worked at least six months or more for Kodak, he/she shall each receive a minimum of $3,000.00 plus an amount proportionate to the number of weeks he/she worked for Kodak as reflected in Kodak's electronic records provided in this litigation.   For each Class member who did not execute either a TAP or ADR release, and who worked less than six months or more for Kodak, he/she shall each receive $1,000.00.   There are 1762 Class members in Category C.   The total amount allocated for this group is $8,297,750.00.

2.   A total gross payment of $600,000.00 for service awards to the twelve named plaintiffs (Courtney Davis, Cynthia Gayden, Robert Gibson, Jannie Nesmith, Noralean Pringle,

Maria Scott, Victor Smith, Edna Williams, Gladys Alston, Thomas Gainey, and Carrie Rice, and the estate of Olin Singletary), who will each receive a service award of $50,000.[3]

3. A total gross payment of $70,000.00 for service awards to the following thirteen individuals who submitted declarations in support of plaintiffs' Motion for Class Certification and were subject to being deposed (Andrew Gissendanner, Artiville Roberts, J.D. Bonham, Catherine Cliff, Abraham Cyrus, Thaddeus Drains, John Graham, Cleveland Brown, Raymond Carter, Garland Lockett, Sharon Magnolia, Deloris Monroe, and Cornell Walker), as well as ECJ Board Member Mary Dukes, with each receiving $5,000.00 to compensate them for their time and expenses on behalf of the Class.

4. A total gross amount of $458,000.00 shall be allocated to pay ECJ members who are current or former Kodak employees. This includes individual payments of up to

---

[3] The proposed settlement submitted to the Court provided service awards in the amount of $75,000 for the named plaintiffs. As discussed later in this Decision and Order, after the preliminary approval hearing plaintiffs notified the Court that they were voluntarily reducing the requested service awards from $75,000 to $50,000 for each named plaintiff. All the service awards are in addition to what the plaintiffs would receive under the other provisions of the settlement agreement.

$500 per person for reimbursement of their time and expenses in participating in the ECJ, with any remainder being donated directly to the ECJ.

5.   A total gross amount of $9.7 million to compensate plaintiffs' counsel for their attorney fees and reimburse them for expenses incurred.[4]

6.   An amount not to exceed $140,000.00 to reimburse the Claims Administrator for their fees and costs, including the cost of providing the Notice of Class Action Settlement to the Class and administering the Settlement.

7.   A total gross amount of up to $453,000.00 to compensate the Labor Economists/Statisticians and Industrial Psychologist (collectively, the "Experts") for their future time and expenses in connection with the work described in Sections 7.2 and 7.3 of the Settlement

---

[4]   The motion for attorney fees (Docket # 319) was separately briefed and argued before this Court.   The hearing on the motion for attorney fees was held on December 1, 2009, during which the Court posed questions and concerns.   Counsel submitted additional briefs in January 2010.   During the December 1, 2009 hearing, counsel advised the Court that under the terms of the Settlement Agreement the issue of the fairness of the settlement as to the class is an issue "independent" from the determination as to the fairness of the requested attorney fees.   <u>See</u> Transcript of December 1, 2009 (Docket # 338) at pp. 80-82.   Since counsel are in agreement that implementation of the class settlement should proceed independent of the Court's determination on the application for attorney fees, the Court has decided to separately consider and rule on the pending fee application (Docket # 319).

Agreement, and to implement the programmatic relief provisions set forth in subparagraphs of Section 7 of the Settlement Agreement.

In addition to the above-outlined monetary consideration, the Settlement Agreement also provides for non-monetary relief. Specifically, the Settlement provides for the following equitable relief over a four-year term:

! Kodak will maintain and enforce non-discrimination and anti retaliation policies designed to assure equal employment opportunity for its employees;

! Kodak will enforce a policy of not knowingly maintaining or enacting any policy or practice that has the purpose or effect of unlawfully discriminating against any Settlement Class Member or other African American employee on the basis of race;

! Kodak will not retaliate against any Settlement Class Member or other African American employee because he or she: (1) complained of or opposed discrimination on the basis of race at Kodak; (2) testified, furnished information or participated in any investigation,

13

proceeding, or hearing, whether in connection with this lawsuit or any other complaint of racial discrimination at Kodak that may be asserted in the future; or (3) sought and/or received monetary and/or non-monetary relief pursuant to this Settlement;

! Kodak will retain an Industrial Psychologist to assist it in reviewing, enhancing, developing, and/or recommending policies and practices designed to reinforce Kodak's equal opportunity employment policies and practices with regard to compensation, performance evaluations, promotions, and job assignments;

! Kodak will retain two Labor Economists/Statisticians to study existing disparate impact analyses of practices relating to annual evaluations, pay and promotion decisions and to make recommendations to improve those analyses;

! Kodak will develop further enhancements to its existing equal opportunity and diversity training, which may include conducting new training sessions designed to further enhance the effectiveness of Kodak's training

programs. The goal of these enhancements is to continue to ensure that all supervisors understand their responsibility and obligation to report and respond to any alleged violations of Kodak's equal opportunity policies. Within one year of the settlement, Kodak will provide Class Counsel with a written summary of its efforts to expand and enhance its training programs;

! Kodak will maintain and enforce equal opportunity complaint procedures for violations of those policies, and shall enhance its existing equal opportunity training to place even greater emphasis on its complaint procedures and every employee's obligation to identify potential violations of Kodak's EOE policies by utilizing the complaint procedures;

! Kodak will develop a database or spreadsheet to track all complaints of discrimination at Kodak and the resolution/status of such complaints;

! Kodak will empower its External Diversity Advisory Panel to serve as the compliance panel for this Settlement and ensure that the Settlement Agreement is followed.   The

ECJ will be able to recommend two individuals to work with the External Diversity Advisory Panel for this purpose; and

! No later than thirty (30) days after the Final Approval date, Kodak will provide to each of its current employees in the United States a written communication that reflects the Company's commitment to diversity, and equal employment opportunity. At least once annually thereafter during the term of this Agreement, Kodak shall provide a similar communication to each of its then current employees in the United States. The communications will be signed and issued by the Chief Executive Officer of Kodak.

Finally, for the four-year term of this Settlement Agreement, Kodak shall provide an annual report to Class Counsel relating to its compliance with the terms of this Settlement.

<u>Notice to the Class</u>

On June 4, 2009, after an extensive preliminary approval hearing,[5] this Court granted preliminary approval of the proposed

---

[5] The preliminary approval hearing was held on May 19, 2009.

settlement, and approved the "Notice of Class Action Settlement" (the "Notice"). (Docket # 315).  The Court directed the parties to mail the Notice to the Class pursuant to the Settlement Agreement. Pursuant to the Settlement Agreement, within ten business days after the Preliminary Approval Date, defendant was directed to provide to the Claims Administrator a list of all Proposed Class Members, including last known address and telephone number, social security number and employee ID number.  See Settlement Agreement (Docket # 313) at section VIII.  The Claims Administrator was directed to mail the Notice to Proposed Class Members by United States first class mail, postage prepaid, within ten business days after the date after defendant provided the list of all Proposed Class Members.  See id.  In compliance with the Court's directions, on June 29, 2009, the Claims Administrator mailed the Notice to the Class Members based on the list of updated addresses for Class Members that both Kodak and Class Counsel provided the Claims Administrator with.  The Notice advised Class Members of their right to object and to exclude themselves from the Settlement by mailing a written objection or opt-out statement by August 3, 2009. Out of the total class of 3020 members, only twelve opted out and only eleven mailed objections.

17

The Final Fairness Hearing

Over two full days (October 23, 2009 and on November 5, 2009), this Court held a final fairness hearing in accordance with Rule 23(e)(2) of the Federal Rules of Civil Procedure ("FRCP") with respect to the proposed settlement.   As expected, the hearing attracted considerable interest.   Arrangements were made by the Court to utilize the large ceremonial courtroom for the hearing and allowing those unable to gain seating in the courtroom to watch the proceedings by closed circuit video conference in the jury assembly room.  Several hundred interested individuals, most of them members of the organizational plaintiff (ECJ), attended the hearing.   On the second day of the hearing, the ceremonial courtroom was used along with two closed circuit locations, the second large courtroom and the jury assembly room.

During the final fairness hearing, counsel for the plaintiffs and Kodak gave lengthy presentations in support of the settlement. In addition, over sixty individuals addressed the Court either in support of or opposition to the settlement.   Many of those who spoke were individuals who were members of ECJ but were excluded from participating in the monetary benefits of the proposed settlement because the dates of their employment with Kodak were outside of the defined settlement class.  Some of these individuals had already corresponded directly with the Court between the time

18

of the preliminary approval hearing and the final fairness hearings voicing their objections and concerns with respect to the proposed settlement.

It is important to note that in advance of the final fairness hearing and because of the volume and nature of correspondence received by the Court[6], I notified all counsel that I would allow any individual who wanted to address the Court as to the fairness of the settlement the opportunity to do so.  I made this decision notwithstanding that many individuals who wanted to address the Court would not be obtaining monetary relief contemplated by the settlement if the settlement was approved.  In my view, one of the issues presented in terms of the fairness of the settlement was the establishment of the "cut-off date" for employment with Kodak in order to be included in the proposed class.  The correspondence received by the Court indicated that a significant number of former employees were upset that the class defined by the settlement would not allow them to share in the proposed monetary relief because their employment with Kodak was not encompassed by the class as defined in the settlement agreement.  Whether the class definition was fair to those excluded from the class depended in large part on

---

[6]  The Court forwarded copies of all correspondence received relating to the case and the settlement to counsel for plaintiffs and Kodak.

the legal basis for the definition of the proposed class.  Thus, in addition to allowing any former employee of Kodak to speak at the hearing, I also directed counsel to brief the effect the statute of limitations had on the settlement negotiations and the settlement agreement as proposed.  Counsel for both plaintiffs and Kodak objected to the Court allowing a former employee of Kodak who was not part of the defined class from speaking as to the fairness of the proposed monetary relief in the settlement agreement.[7]  The Court denied the objection and allowed any former employee of Kodak who wanted to be heard on the fairness of the settlement to speak.

As indicated above, over sixty individuals spoke during the two-day hearing.  Those who addressed the Court introduced numerous exhibits, which, to the extent relevant,[8] have been considered by

---

[7] Counsel did not object to allowing former Kodak employees who were not included in the defined class from speaking as to the fairness of the non-monetary relief so long as the employee was a member of the ECJ.

[8] During the fairness hearings ECJ representative Lizzie Cyrus asked the Court to listen to (1) recorded conversations of class counsel explaining the proposed settlement agreement to ECJ members and (2) a surreptitiously recorded conversation between Clayborne E. Chavers, Esq., one of plaintiffs' class counsel and Ms. Cyrus. Ms. Cyrus admitted that she deliberately misrepresented her identity to Mr. Chavers when she spoke to him.  See Transcript of October 23, 2009 Proceedings (Docket # 335) at pp. 173-184 and November 5, 2009 Proceedings (Docket # 336) at pp. 166-169. Plaintiffs filed a motion for protective order (Docket # 328) to prohibit the introduction of the tapes of these conversations or, in the alternative, to deem the recordings not relevant to the issues that the Court must determine.  I agree with plaintiffs that the tapes as described are not relevant and will not be considered.

the Court.  Despite strong disagreements as to the fairness of the settlement, every person who addressed the Court was respectful and followed the Court's direction to focus their comments to the fairness of the proposed settlement.

## **Discussion**

## I.   **Class Certification**

Plaintiffs have moved for final approval of the Settlement Class.  On June 4, 2009, this Court preliminarily certified this case as a class action under FRCP Rule 23(b)(3).  (Docket # 315).  Specifically, the Court preliminarily certified the Class as follows:

> All African-American individuals employed by Kodak in the United States for at least one day between January 1, 1999 and May 18, 2006, excluding interns/co-ops, individuals who were officers or executives, and individuals who previously entered into individual releases (other than or in addition to TAP or ADR releases) as part of individual settlement agreements with Kodak.

_____

Putting aside the issue of privilege, the substance of legal advice as to the fairness of the settlement as given by class counsel to his clients is of no concern to this Court in the present proceeding.  The Court must make an _independent_ determination of the fairness of the proposed settlement.  Similarly, the surreptitiously recorded conversations between Ms. Cyrus and Mr. Chavers is not relevant to issues before the Court.  Because the Court has declined to consider the content of the tapes, plaintiffs' motion for protective order (Docket # 328) is **denied as moot**.

See Docket # 315.   The parties now jointly argue that class certification is appropriate pursuant to Rules 23(a) and 23 (b)(3) of the Federal Rules of Civil Procedure.   For the reasons that follow, I agree.

Before a class may be certified, the party seeking class certification must satisfy two requisites under FRCP Rule 23. First, plaintiffs must show that the four requirements under Rule 23(a) are met: (i) the class is so numerous that joinder of all members is impractical; (ii) there are questions of law and fact common to the class; (iii) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (iv) the representative parties will fairly and adequately protect the interests of the class.   See Fed. R. Civ. P. 23(a).   Second, plaintiffs must show that at least one of the provisions of FRCP Rule 23(b) is satisfied.   Here, plaintiffs seek to show they satisfy Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).

A. Requirements of Rule 23(a)

1. Numerosity: The class is undeniably large, and joinder of all the members would be a formidable challenge.  The parties agree that the Settlement Class here meets the numerosity requirement because there are over 3000 members of the putative settlement class.  See Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) (stating that "numerosity is presumed at a level of 40 members"); Edge v. C. Tech Collections, Inc., 203 F.R.D. 85, 89 (E.D.N.Y. 2001)("Generally, courts will find a class sufficiently numerous when it comprises forty or more members."). In any event, "impracticable" joinder of all the members simply means difficult or inconvenient, not impossible, joinder.  See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)("Impracticable does not mean impossible.").  Under this standard, the numerosity requirement is certainly met.

Kodak produced Human Resources data including the time period from January 1, 1995 to May 1, 2005.  The Human Resources data produced contains information for 5,884 African American employees. Thus, plaintiffs have offered reasonable proof that their claims meet the numerosity requirement.  In determining whether a proposed class is so numerous that joinder of all members is impracticable, courts consider various factors, including "judicial economy arising from the avoidance of a multiplicity of actions, geographic

23

dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." See Robidoux v. Celani, 987 F.2d at 936. I find that the application of these factors to the instant action does support a grant of class certification. First, the prospective class members are geographically dispersed, as they are located throughout the United States. Second, the proposed members' limited economic resources make it unlikely that separate actions would be brought if the plaintiffs' motion were denied. The Court further finds that joinder of all members of the class is impracticable, as many may be reluctant to serve as named plaintiffs in an action against the company by whom many are still currently employed or receive retirement benefits. In addition, a significant aspect of the relief plaintiffs seek in this case is injunctive in nature. In sum, the numerosity requirement is thus met, as "the class is so numerous that joinder of all members is impracticable" and certification is warranted in regard to the prerequisite of numerosity. See Fed. R. Civ. P. 23(a)(1).

2. Commonality: The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact. See Fed. R. Civ. P. 23(a)(2). It is "not require[d] that each class member have identical claims as long as at least one common

24

question of fact or law is evident." *In re* Currency Conversion Fee Antitrust Litig., 224 F.R.D. 555, 562 (S.D.N.Y. 2004).   Here, common issues of law and fact predominate over the case.   The issues primarily concern Kodak's policies and practices in the workplace with respect to its African American employees. Plaintiffs' statistical evidence resulting from Kodak's own internal [EEOC] study, along with the expert reports of Dr. Madden and Dr. Greenwald, supports their class allegations and presents common issues shared by plaintiffs and Class members.  Plaintiffs' allegation that Kodak utilized a centralized policy or practice of delegating substantial discretion to its supervisors to make personnel decision in the area of wages, promotions, performance appraisals, job assignments, and layoffs, to the detriment of its African American employees, presents a common issue of fact sufficient to support a finding of commonality.   Moreover, plaintiffs have proffered evidence suggesting that Kodak's performance appraisal system is deficient in its design and that Kodak fails to provide proper training to its supervisors and managers who use this system.   This is further proof of common questions of fact, supporting a finding of commonality.

The common issues here predominate over any individual variations and are sufficient to satisfy the commonality requirement, which is "generally considered a 'low hurdle' easily

surmounted." _In re_ Prudential Secs. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995)(citation and internal quotations omitted). Plaintiffs have demonstrated that the core class grievances flow out of a centralized pay, promotion and performance appraisal system which allegedly favored white employees at the expense of African American employees.

3. Typicality: Typicality requires that the claims of the class representatives be typical of those of the Class, and "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." Robidoux, 987 F.2d at 936. In this case, the claims of the representative plaintiffs and the claims of every class member arise from similar conduct by Kodak -- alleged discriminatory employment practices. The claims of the representative plaintiffs are based on the same legal theories and pattern of allegedly unlawful conduct as the claims of each member of the Class. Reduced to their essentials, the claims of both the class representatives and the proposed class members rest upon allegations that Kodak discriminated against its African American employees in the area of wages, promotions, performance appraisals, job assignments and layoffs. The successful prosecution of both sets of claims would therefore require the named plaintiffs to make legal arguments similar to those of the

proposed class members. To the extent there is any variation, such differences do not defeat the typicality requirement. See In re Oxford Health Plans, Inc., 191 F.R.D. 369, 375 (S.D.N.Y. 2000)("Typicality does not require that the situations of the named representatives and the class members be identical."). Accordingly, Rule 23(a)(3's) typicality requirement is satisfied.

4. Adequacy: To establish adequacy of representation, plaintiffs must show (1) that plaintiffs' counsel is competent to handle the case and (2) that there are no conflicts of interest among the class members. See In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997)("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.").

With respect to the first prong, the attorneys representing the putative class are qualified, experienced and generally able to conduct the litigation. Plaintiffs' counsel have experience with complex class action litigation in federal courts. Plaintiffs' counsel have vigorously pursued all rights and interests of plaintiffs and the Class, and I am confident that they will continue to do so. Plaintiffs' lawyers have competently handled the variations in the plaintiffs' positions and worked hard to obtain a settlement that resolves issues faced by all members of

the Class.  Plaintiffs have thus shown that the first prong of the adequacy requirement is satisfied.

With respect to the second prong, the adequacy requirement is not satisfied unless the class representatives are part of the Class and "possess the same interest and suffer the same injury as the class members."  <u>Amchem Prods., Inc.</u>, 521 U.S. at 625-26 (citations and internal quotations omitted).  In this case, the interests of the named plaintiffs and the Class are the same, as they both seek to address Kodak's challenged centralized policies and practices at issue.  The class representatives suffered the same specific injury as the class members -- discrimination based on race in the workplace.  Moreover, the class representatives' efforts to establish Kodak's pattern or practice of discrimination, hostile work environment and retaliation will not pose any conflict of interest with the virtually identical claims of the class members.  The class representatives also have the same interest as the rest of the class members and are in a similar position with respect to their ability to obtain a remedy in view of Kodak's defenses.  Under these circumstances, there appears to be no actual or potential conflict of interest between the class representatives and the class members they seek to represent.  For the foregoing reasons, Rule 23(a)(4)'s adequacy requirement has been satisfied.

B. Requirements of Rule 23(b)(3)

To certify a class, plaintiffs must also satisfy one of the provisions of Rule 23(b). Plaintiffs urge the Court to find under Rule 23(b)(3) "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

1. Predominance: "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc., 521 U.S. at 623. To meet the predominance requirement of Rule 23(b)(3), plaintiffs must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole,. . . predominate over those issues that are subject only to individualized proof." Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 107-08 (2d Cir. 2007)(citation and quotation omitted). Here, class treatment is appropriate because members of the Class allege the same discriminatory employment practices of Kodak. The same evidence would be used to prove the claims against Kodak whether the claims proceed as a class action or individual actions. Under these circumstances, plaintiffs meet the predominance requirement. See

29

*In re* NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 517 (S.D.N.Y. 1996)(noting that the predominance requirement is generally satisfied "unless it is clear that individual issues will overwhelm the common questions").

2. Superiority: Rule 23(b)(3) further requires "that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In assessing whether to certify a class under Rule 23(b)(3), a court should consider the following nonexclusive factors: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum. Fed. R. Civ. P. 23(b)(3)(A)-(C). These factors weigh in favor of certification.[9]

With respect to the first factor, the individual members of the Class do not have a substantial interest in individually

---

[9] When faced with a request for settlement-only class certification, a district court need not consider Rule 23(b)(3)(D)'s fourth factor, which is "the likely difficulties in managing a class action." See Amchem Prods., Inc., 521 U.S. at 620. It should be noted, however, that Kodak has identified numerous manageability issues relating to class certification. See Kodak's Memorandum of Law in Further Support of Preliminary Approval of Settlement (Docket # 310).

prosecuting their cases. While the class-wide damages are considerable in the aggregate, the individual damages may be too small to make litigation worthwhile. The advantage of the class action is that it permits plaintiffs "to pool claims which would be uneconomical to litigate individually." Phillips Petroleum Co. v. Schutts, 472 U.S. 797, 809 (1985). Certification is favored where, as here, the individual class members "may have insufficient economic justification for commencing expensive litigation." In re Industrial Diamonds Antitrust Litig., 167 F.R.D. 374, 386 (S.D.N.Y. 1996).

The second and third factors also weigh in favor of certification. The Court is unaware of any other related cases pending in other state or federal courts. This Court is an appropriate forum for this case as it has authority to approve a release of nationwide class claims. Based on a consideration of these factors, the Court concludes that a class action is a superior method of adjudicating this case and that certification of the Settlement Class is appropriate. The Settlement Class is therefore certified.

## II.  Approval of the Settlement Agreement

Having determined that this case meets the requirements for a settlement class action pursuant to Rule 23, the Court turns next to an examination of the settlement terms. A court may approve a

class action settlement only after holding a hearing and finding that the settlement is fair and reasonable. Fed. R. Civ. Proc. 23(e)(2). In making this determination, the court must consider both the procedural fairness of the settlement negotiations and the substantive fairness of the settlement itself. McReynolds v. Richards-Cantave, 588 F.3d 790, 803-04 (2d Cir. 2009); D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001). "When a settlement is negotiated prior to class certification, as is the case here, it is subject to a higher degree of scrutiny in assessing its fairness." D'Amato v. Deutsche Bank, 236 F.3d at 85.

1. Procedural Fairness: In assessing the fairness of the negotiating process, the court reviewing a proposed settlement must "pay close attention to the negotiating process" and specifically that (1) the proposed settlement "resulted from arm's-length negotiations"; (2) that plaintiffs' lawyers possessed the necessary ability and experience to negotiate a fair settlement; and (3) that plaintiffs' counsel have "engaged in the discovery, necessary to effective representation of the class's interests." McReynolds v. Richards-Cantave, 588 F.3d at 804. A presumption of fairness may arise when the court determines that the class settlement was achieved after "arm's-length negotiations between experienced, capable counsel after meaningful discovery." Id. at 803 (citation and quotations omitted).

The Court finds that the proposed settlement meets the requirement of procedural fairness. Although the Court was not directly involved in the mediation or settlement process, it is clear that the settlement was achieved only after extensive litigation and discovery had occurred allowing both sides to understand the risks of proceeding further in the litigation. The parties have advised that the general framework of the settlement was achieved only with the assistance of an experienced and skilled mediator[10] and, even then, further negotiations and compromise were necessary to reach a final agreement. Moreover, this Court has firsthand knowledge of the experience and ability of plaintiffs' counsel and determines that counsel was not only capable, but also determined to vigorously represent the plaintiffs in order to achieve a fair and just result for the proposed settlement class.

2.  Substantive Fairness:  The substantive fairness of the settlement is examined according to the so-called "Grinnell

---

[10]  The mediator, Professor Eric Green, has experience in mediating complex class action lawsuits. See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 117 (2d Cir. 2005).  The Court notes that "[a]rm's-length negotiations involving counsel and a mediator raise a presumption that the settlement they achieved meets the requirements of due process." McMahon v. Olivier Cheng Catering & Events, LLC, No. 08 Civ. 8713(PGG), 2010 WL 2399328, at *4 (S.D.N.Y. Mar. 3, 2010).  During the final fairness hearing, several ECJ members opposed to the settlement suggested that Mr. Green was a Kodak affiliated agent or employee.  Based on the evidence presented at the hearing, I find those claims to be without factual support.

factors". <u>City of Detroit v. Grinnell Corp.</u>, 495 F.2d 448 (2d Cir.

1974), *abrogated on other grounds by* <u>Goldberger v. Integrated Res.,</u>

<u>Inc.</u>, 209 F.3d 43 (2d Cir. 2000).  The <u>Grinnell</u> factors are: (1)

the complexity, expense and likely duration of the litigation; (2)

the reaction of the class to the settlement; (3) the stage of the

proceedings and the amount of discovery completed; (4) the risks of

establishing liability; (5) the risks of establishing damages; (6)

the risks of maintaining the class action through the trial; (7)

the ability of the defendants to withstand a greater judgment; (8)

the range of reasonableness of the settlement fund in light of the

best possible recovery; and (9) the range of reasonableness of the

settlement fund to a possible recovery in light of all the

attendant risks of litigation.  <u>City of Detroit v. Grinnell Corp.</u>,

495 F.2d at 463.  Having determined that negotiations which

culminated in the settlement agreement were procedurally fair, the

Court now turns to an examination of the substantive merits of the

proposed settlement in light of the <u>Grinnell</u> factors.

    <u>Complexity, expense and likely duration of litigation</u>: "Most

class actions are inherently complex and settlement avoids the

costs, delays and multitude of other problems associated with

them." *In re* <u>Austrian & German Bank Holocaust Litig.</u>, 80 F. Supp.

2d 164, 174 (S.D.N.Y. 2000), <u>aff'd</u>, 236 F.3d 78 (2d Cir. 2001).

The prior proceedings in this case attest to the unusual complexity

of this litigation and the significant costs to all parties that
would be incurred by continued litigation.   While the parties have
aggressively litigated this case to this point, the fact remains
that substantial hurdles remain and it could be years before class
members achieved any recovery, if they recovered at all.  See _In re
Veeco Instruments Inc. Sec. Litig._, No. 05 MDL 0165(CM), 2007 WL
4115809, at *7 (S.D.N.Y. Nov. 7, 2007)(approving settlement and
concluding that "[d]elay, not just at the trial stage but through
post-trial motions and the appellate process, would cause Class
Members to wait years for any recovery, further reducing its
value").   Indeed, plaintiffs' counsel estimated a trial on the
class action claims "would last at least three months, and could
last conceivably longer."   See Transcript of October 23, 2009
(Docket # 335) at p. 30.   Moreover, the considerable expense and
duration of further litigation would disadvantage the class members
by potentially reducing the class recovery and providing a
disincentive to later settlement.   Thus, the Court agrees with both
parties that litigating this case through trial would be a complex,
expensive[11] and time consuming process.   Application of the first
_Grinnell_ factor weighs heavily in favor of approval of the

---

[11]  Plaintiffs' counsel stated that class counsel had expended 1.6
million dollars "on out-of-pocket expenses on this case to date",
including hundreds of thousands of dollars on experts.   See
Transcript of October 23, 2009 proceedings at pp. 32-33.

Settlement.

    <u>Reaction of the Settlement Class to the Settlement</u>: Members of the class as defined appear to be overwhelmingly in favor of the Settlement.  Adequate notice of the proposed settlement was provided to the class members setting forth clear instructions as to how to submit objections to the Court.[12]  Of approximately 3020 class members, only eleven (*i.e.*, approximately one third of 1%) filed any objection with the Claims Administrator, and only twelve class members asked to be excluded from the Settlement.[13]  <u>See</u> September 23, 2009 Declaration of Edward J. Sincavage annexed as Exhibit "2" to Docket # 324.  The small number of opt-outs and objections relative to the size of the Class indicates a positive reaction of the Class.  <u>See</u> <u>Wal-Mart Stores, Inc.</u>, 396 F.3d at 118 (concluding that only eighteen objections from a class of five million was indicative of the adequacy of the settlement); <u>D'Amato</u>,

---

[12] In addition to the Court approved notices, class counsel advertised the settlement on an internal website known to many class members:  www.kodakdiscrimination.com.

[13] As stated earlier, many of those who spoke at the final approval hearing and otherwise communicated with the Court in writing, were former employees of Kodak who were excluded from the definition of the class as it was defined.  While many of these individuals objected to the Court approving the settlement as proposed because they would not share in the monetary benefits of the settlement, they are not "counted" as objections filed with the Claims Administrator.  Their dissatisfaction with the class definition was recognized by the Court during the final approval hearing and is addressed in this Decision and Order.

236 F.3d at 86-87 (holding that the district court properly concluded that eighteen objections from a class of 27,883 weighed in favor of settlement). Given the exceedingly small number of class members who opted out or objected to the Settlement, the Court finds that the reaction of the Class (as defined by the Settlement Agreement) has been overwhelmingly positive and this weighs in favor of Settlement approval.

Stage of the proceedings and amount of discovery completed: The Settlement Agreement in this case was not negotiated in the early stages of the dispute. The parties entered into the Settlement Agreement only after extensive discovery and litigation. During the discovery process, the parties were able to develop the facts necessary to evaluate the claims and adequacy of the Settlement. Plaintiffs' counsel obtained and reviewed hundreds of thousands of pages of documents from Kodak and others, conducted dozens of depositions, retained and consulted with experts, extensively litigated discovery issues before this Court, and prepared comprehensive motions seeking nationwide class certification. Further, Kodak disclosed to plaintiffs an electronic copy of its human resource database which was thereafter analyzed by plaintiffs' statistical experts. The Court simply has no concern that pretrial discovery was conducted to simply justify a settlement, but truly was "an aggressive effort to ferret out

facts helpful to prosecution of the suit." <u>Frank v. Eastman Kodak Co.</u>, 228 F.R.D. 174, 185 (W.D.N.Y. 2003)(internal quotation and citation omitted).   In sum, I conclude that the parties have conducted sufficient discovery to understand the strengths and weaknesses of plaintiffs' claims.   Hence, this <u>Grinnell</u> factor weighs in favor of settlement approval.

<u>Risks of establishing liability and damages</u>: The fourth and fifth <u>Grinnell</u> factors require the Court to consider the risks plaintiffs face in establishing liability and damages.   While the Court "is not required to decide the merits of the case or resolve unsettled legal questions," <u>Frank v. Eastman Kodak Co.</u>, 228 F.R.D. at 185 (quoting <u>Carson v. Am. Brands, Inc.</u>, 450 U.S. 79, 88 n.14 (1981)), it is apparent that this litigation is not only fraught with questions as to Kodak's liability but also has several important unsettled legal questions.

Plaintiffs candidly and accurately recognize the risks associated with establishing liability and damages against Kodak in this case.   Kodak has vigorously denied wrongdoing, and plaintiffs acknowledge that "there exists the risk that Defendant might be able to prevail on summary judgment, trial or on appeal." <u>See</u> Plaintiffs' Memorandum of Law annexed to Docket # 324 at p. 36. For example, plaintiffs face difficult and evolving issues as to the statute of limitations for their claims.   <u>See</u>, <u>e.g.</u>, Exhibit

"5" annexed to Docket # 324.   Plaintiffs also admit that defendant's pending summary judgment motion (Dockets # 243 and # 245) on the hostile work environment claims present risks as the Court could ultimately dismiss or limit those claims.   At this juncture of the litigation perhaps the most obvious risk to plaintiffs relates to the issue of releases.   Over eleven hundred putative class members signed TAP releases at the conclusion of their employment with Kodak and this Court has upheld the validity of those releases.   If the Court's decision on the TAP releases was affirmed by the Second Circuit, those plaintiffs could not pursue any federal discrimination claims and would face a similar obstacle in prosecuting their state claims against Kodak.   In addition to the TAP releases, 79 putative class members executed an "ADR" release.   Although the issue was never directly litigated in this case, Judge Larimer upheld the validity of an ADR release in a separate lawsuit involving former Kodak employees.   Kodak most certainly would seek a similar ruling in this litigation.   See Wright v. Eastman Kodak Co., 445 F. Supp. 2d 314, 320 (W.D.N.Y. 2006)("Plaintiffs cannot have it both ways: enjoying the substantial monetary benefits that Kodak agreed to give them as consideration for the releases, but then asking that they be excused from living up to their end of the bargain by honoring those releases.").

Other issues and circumstances exist that present substantial risks to plaintiffs in terms of proving both liability and damages. That many of plaintiffs' claims arose over a decade ago presents obvious difficulties in obtaining discovery and presenting evidence at trial.   Moreover, even if plaintiffs prevailed at trial, they would face complex evidentiary and legal issues in establishing damages.   Indeed, Kodak's damage expert, Harvard University Professor Dr. David E. Bloom, analyzed historical payroll data and concluded that (1) there were no race based disparities in promotion and compensation at Kodak between 1999 and 2005, and (2) African-Americans were, in fact, statistically *favored* in promotion and base salary increases during the 1999-2005 time period.   See January 15, 2010 Declaration of Dr. David E. Bloom, Ph.D., annexed as Exhibit "A" to Docket # 345.   These risks and others make the fairness of the settlement all the more evident and weigh in favor of approving the Settlement Agreement.

Risks of Maintaining the Class Through Trial: The risk of maintaining class status through trial weighs in favor of settlement.   Kodak vigorously contests class certification in this case on a variety of grounds and, should the litigation proceed, the merits of Kodak's arguments remain a looming threat to

plaintiffs' efforts to prosecute this case as a nationwide[14] class action.  From the beginning of this case Kodak has argued with some force that manageability issues made this case unlikely to proceed successfully as a class action, particularly in light of the individual nature of each putative class member's claims as to both liability and damages.  See Kodak's Memorandum of Law in Support of Preliminary Approval of Settlement (Docket # 310) at pp. 5-8.  Even if the Class was certified, there exists a significant risk that the Class could not be maintained through trial.  Courts have discretion to re-evaluate the appropriateness of class certification at any time.  Absent the Settlement, plaintiffs run the risk that class certification might not be granted, or, if granted, it may have been rejected on appeal or later decertified by the Court.  All of these risks support the reasonableness of the proposed settlement.

Ability of the defendants to withstand a greater judgment: While Kodak has continued to engage in a series of downsizing and restructuring plans in an effort to focus on digital technology, I find that the company could likely withstand a greater judgment than the Settlement contemplates.  In this context, however,

---

[14]  Although plaintiffs are prosecuting this case as a nationwide class action, the Court could have certified a class that was far less encompassing than plaintiffs sought.

fairness "does not require that the [defendant] empty its coffers before" a settlement can be found adequate, as "the ability of defendants to pay more, on its own, does not render the settlement unfair, especially where the other Grinnell factors favor approval." McBean v. City of New York, 233 F.R.D. 377, 388 (S.D.N.Y. 2006).   While Kodak remains a substantial company, unpredictable economic risks always exist, particularly in today's volatile business environment.   Providing substantial and certain relief (both monetary and injunctive) eliminates this risk and weighs in favor of final approval of the Settlement.

Range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation: The final two Grinnell factors require the Court to consider whether the Settlement falls within the range of reasonableness.   "[T]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." Wal-Mart Stores, Inc., 396 F.3d at 119 (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972)).

Taking into account both the "best possible recovery" and the risks inherent in taking the litigation to completion, I find the proposed settlement to be within the range of reasonableness.   The

proposed settlement provides a substantial and comprehensive remedy

to class members.  In addition to expansive injunctive relief that

benefits all Kodak employees and not just members of the settlement

class, the proposed settlement guarantees a cash payment of over

9.6 million dollars to category "A", "B" and "C" class members.  Of

those putative class members who did not sign a TAP release, the

proposed settlement pays over 8.7 million dollars, a sum that,

according to plaintiffs' damages expert, represents over 40 percent

of "lost wages" for Kodak workers in the defined settlement class

for the period between 1999 and 2008.  See Transcript of November

5, 2009 Proceedings (Docket # 336) at p. 142.  Class counsel

advised the Court that the overall settlement amount is one of the

largest in an employment discrimination class action case in recent

history.

    But "[t]he dollar amount of the settlement by itself is not

decisive in the fairness determination." In re Agent Orange Prod.

Liab. Litig., 597 F. Supp. 740, 762 (E.D.N.Y. 1984).  The Court

must judge the settlement not only in terms of the best possible

recovery, but also upon consideration of the strengths and

weaknesses of plaintiffs' case.  See id. As set forth at the final

settlement hearing, the attendant risks in proceeding with this

litigation were clearly an important consideration in plaintiffs'

decision to settle the case.  And, as set forth herein, I find

those risks to be real and substantial.

In sum, I find that the proposed settlement provides a substantial recovery for the Class and falls within the range of reasonableness in view of the risks of litigation that plaintiffs face.

3. <u>Objections to the Settlement</u>

Following notification of the Settlement, eleven of the 3020 class members submitted objections.  The majority of the objections surround the adequacy of the monetary relief to class members. Other objections include objections: (1) to the class period incorporated in the class definition; (2) that Kodak is not being held accountable and the Settlement Agreement contains no admission of liability; (3) to the plan of allocation in the Settlement Agreement; and (4) to the proposed service awards.  In addition, as explained below, numerous individuals who were excluded from the proposed settlement class voiced objections to the proposed settlement.  After careful consideration of the objections and the relevant evidence submitted to support them, I conclude that none of the objections provide an adequate basis to reject the Settlement.

<u>Objection to the adequacy of relief</u>: Objections were received that the Settlement should provide more relief.  Several class members objected to the amount they are to receive in their

respective categories pursuant to the Settlement Agreement, complaining that the amounts are too small to compensate them for the many years of discrimination they suffered while employed at Kodak. Similar complaints were heard from those who were not included in the putative class as defined by the Settlement Agreement.

Despite these objections, the fact remains that the vast majority of Class Members have not objected to the proposed settlement. In terms of those actually sharing in the monetary relief, less than one half of one percent objected to the Settlement. Although many of the objections were vigorously asserted, the Court's fiduciary duty is to protect all Class members -- including the "silent majority" who have not voiced any objections to the Settlement Agreement. "[T]he mere fact that the only class members expressing opinions regarding the settlement were a vocal minority opposing it does not alter the district court's discretion in approving the settlement or its duty to protect the interests of the silent class majority". Grant v. Bethlehem Steel Corp., 823 F.2d 20, 23 (2d Cir. 1987)("The district court had a fiduciary responsibility to the silent class members, despite vociferous opposition to the settlement, and their interests properly were protected by the court."). Many "objectors wrongly assume [that Kodak's] guilt [for wage discrimination] would

be proven at trial.  Such assumption cannot stand as a proper basis to evaluate the proposed settlement's fairness."  Thompson v. Metro. Life Ins. Co., 216 F.R.D. 55, 66 (S.D.N.Y. 2003)(citing Grinnell, 495 F.2d at 458-59).  While seeking greater compensation from Kodak for alleged discrimination may be preferable to the objectors, none of the objectors (within or outside the defined settlement class) have provided the Court any reason to fairly conclude achieving such relief is likely given the numerous substantive and procedural risks associated with proceeding with the litigation.

Objections to the class period incorporated in the class definition:  Among the objections made by those not included in the proposed settlement class, the most resounding concerned the definition of the class period, which required employment with Kodak between January 1, 1999 and May 18, 2006.  To make sure that this was a reasonable settlement term, the Court required the parties to specifically address this issue in their briefs to the Court and in their presentations during the final fairness hearing.

The Complaint in this case alleges that for many years Kodak engaged in "an ongoing pattern and practice of discrimination against its African American employees," including discrimination in compensation, promotions, wage and job classifications, and maintaining a hostile work environment.  See Third Amended

46

Complaint (Docket # 106) at ¶ 3.   Plaintiffs also claim that
"[w]hen African American employees of Kodak complain[ed] about" the
discriminatory practices and policies to Kodak's management, they
were "subjected to retaliation." Id. at ¶ 3(e).  In 2004, the EEOC
determined that: (1) weekly pay rates for white employees of Kodak
were consistently higher than weekly pay rates for black employees;
(2) Kodak maintained a hostile work environment with respect to its
African American employees; and (3) Kodak retaliated against
African American employees who participated in protected
activities.  See Third Amended Complaint (Docket # 106) at ¶¶ 50-
51.

     While Kodak unequivocally disputes both the determination of
the EEOC and the allegations in the Complaint, there can be no
dispute that the relationship between Kodak and many of its
African-American employees has resulted in workplace tension,
distrust and animosity.   These emotions were readily apparent
during the final fairness hearing.   The hard fact is that many
former African-American employees of Kodak who believe they too
were subjected to race based discrimination in pay, promotions and
workplace hostility will not share in the economic benefits of the
proposed settlement because the time periods of their employment
with Kodak are outside those defined in the settlement class.   This
hard fact has not only spread further distrust towards Kodak, but

has also spawned distrust and hostility towards the named plaintiffs and class counsel.

In the final analysis, the definition of the negotiated settlement class was a function of the statute of limitations applicable to the claims asserted by plaintiffs in their Complaint. "The public policy purpose of statutes of limitation is fairness for all parties concerned. They provide a reasonable time in which a Plaintiff must discover and allege that he has been wronged, while providing that a defendant will not be unfairly hauled into court many years after an alleged wrong has occurred, when a defense would be difficult due to the passage of time." Armbrister v. Roland Int'l Corp., 667 F. Supp. 802, 825 (M.D. Fla. 1987); see also Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992)("The function of a statute of limitations is to set a time after which conduct will not be subject to challenge, on any grounds. After the statutory period has passed, the plaintiffs may not bring the action regardless of the relief requested."). After reviewing counsels' submissions on the applicable statute of limitations and considering the representations made at the final fairness hearing as to how the class definition was negotiated, the Court concludes that the parameters of the settlement class are consistent with the periods of limitations relevant to plaintiffs' claims and hence are a fair and reasonable component of the

48

proposed settlement.

Of the named plaintiffs in this action, the earliest EEOC charge was filed by plaintiff Robert Gibson on July 13, 2001. Thereafter, on February 6, 2003, tolling agreements were entered into between Kodak and plaintiffs' former counsel as to some individuals.  The tolling agreements encompassed both Title VII claims and discrimination claims asserted pursuant to 42 U.S.C. § 1981.  The limitations period for Title VII claims requires a plaintiff to file an administrative charge with the EEOC within 300 days after the alleged unlawful employment practice occurred. Using plaintiff Robert Gibson as the basis for class members to "piggy-back" on his claim results in claims being timely if the individual worked for Kodak as of September 16, 2000 or 300 days before Robert Gibson filed his charge with the EEOC.

The statute of limitations period for § 1981 claims, however, is four years (see Jones v. R.R. Donnelly & Sons, Co., 541 U.S. 369 (2004)), and provides the broadest possible scope of timely claims for plaintiffs.  Based on the tolling agreements, plaintiffs' § 1981 discrimination claims could arguably reach back *four years* — from February 6, 2003 (the date set forth in the first tolling agreement) to February 6, 1999.  While the Court does not doubt that the negotiated definition of the class will deny compensation to many former employees who believe they were subjected to racial

discrimination and injustices just as severe and painful as those to whom are included in the class, the law contains limitations on addressing claims of historical discrimination.   Here, I find that the parties' agreement that the class period covers African American employees who worked for Kodak at least one day since January 1, 1999 is consistent with the law and, therefore, is both reasonable and fair.   See Kodak's Memorandum of Law (Docket # 325) at pp. 4-7; Plaintiffs' Memorandum of Law (Docket # 324) at pp. 29-31.

Objections that Kodak is not being held accountable and the Settlement Agreement contains no admission of liability: I find that since Kodak has agreed to significant injunctive and monetary relief, Kodak is being held accountable for the alleged discrimination despite the fact that they have not admitted liability.   Defendants are not required to admit liability when settling a case.   Settlement is a compromise for both parties -- plaintiffs are guaranteed to receive certain compensation and injunctive relief while Kodak achieves certainty and finality in resolving pending and risky litigation.   Thus, this category of objection is not grounds for rejecting the Settlement.

Objections to the plan of allocation of the Settlement: Certain objections relate to the plan of allocation outlined in the Settlement Agreement.   Given the variables inherent in this

litigation (*i.e.*, "TAP Release" plaintiffs, "ADR Release" plaintiffs, "No Release" plaintiffs), the allocation plan in the proposed settlement reflects both innovation and fairness. Assigning the majority of the Settlement's economic benefits to employees who did not sign releases demonstrates the intent to direct the most compensation to those who did not release discrimination claims in exchange for enhanced severance benefits or other consideration. The variable allocations also indicate the parties considered the impact of this Court's ruling as to the validity of the releases when negotiating the relative "value" of individual claims. Among plaintiffs who did not sign releases, there clearly is no perfect way to assign a value to their claims of discrimination. Holding individualized "damage" hearings among thousands of individuals from around the country would be costly, time consuming, and unwieldy, and would defeat the purpose of a class action settlement. However, increasing compensation depending on length of service is a reasonable alternative. Varying compensation based on length of service appropriately reflects the fact that longer service will correspond with more harm in terms of both economic damages (longer service equals longer disparity in pay and promotions) and emotional damages (longer service equals greater exposure to a hostile work environment). In sum, I find the allocation plan in the proposed

settlement to be fair and reasonable.

Objections to the proposed service awards: Of all the
components of the proposed settlement, the "service awards" are the
most problematic to this Court.  I have made no secret of my
concerns with respect to the service awards.  These concerns do not
involve the appropriateness of service awards, particularly in
employment discrimination cases such as this.  "Employees, former
and current, take huge risks when they agree to be named plaintiffs
in a class action bringing legal claims of unlawful bad acts by
employers. Retaliation, isolation, ostracism by co-workers, 'black
listing' by future employers, emotional trauma, and fear of having
to pay defendants' legal fees are among the most obvious." Nantiya
Ruan, Bringing Sense to Incentives: An Examination of Incentive
Payments to Named Plaintiffs in Employment Discrimination Class
Actions, 10 Emp. Rts. & Emp. Pol'y J. 395, 396-97 (2006).  I
recognize and agree that service awards to named plaintiffs in
employment discrimination cases are not only an appropriate way of
recognizing an individual's commitment to pursuing justice in the
workplace, but also of encouraging others to do the same.

The Court's concerns relate to the amount of the service
awards and specifically the relationship or proportionality of
those awards to the recovery allowed for the absent class members.
In this regard, I share the views expressed by Judge Gleeson of the

Eastern District of New York that "[a] particularly suspect arrangement exists where the incentive payments are greatly disproportionate to the recovery set aside for absent class members." Sheppard v. Consol. Edison Co. of N.Y., Inc., No. 94-CV-0403(JG), 2002 WL 2003206, at *6 (E.D.N.Y. Aug. 1, 2002). The danger is that the named plaintiffs are tempted with high incentive awards in exchange for advocating for a settlement that pays suboptimal sums for absent class members. Id. "[C]lass representatives are naturally more inclined to accept a settlement that is not in the best interests of the absent class members they represent if the named plaintiffs are permitted to receive an award in addition to their share of the recovery. The larger the reward, the greater the inclination will be." Sheppard v. Consol. Edison Co., No. 94-CV-403 (JG), 2000 WL 33313540, at *7 (E.D.N.Y. Dec. 21, 2000)(rejecting proposed class action employment discrimination settlement because of the substantial difference between the monetary relief to the named plaintiffs compared to the absent class members).[15]

---

[15]  Plaintiffs argue that the fact that the amount of the service awards were proposed by the mediator is somehow evidence of their reasonableness.  Without diluting the obvious importance of the mediator to achieving the settlement herein, the fact that the mediator proposed $75,000 per plaintiff for service awards does not dilute or alter the Court's concerns.  A mediation is successful if the mediator is able to achieve a settlement agreement.  The mediation process leaves it to the parties and their lawyers to

When the proposed settlement was first presented to the Court, the incentive payments of $75,000 were sought for each named plaintiff.  At the preliminary approval hearing, and in subsequent conferences held with all counsel, I voiced my substantial concerns regarding the amount of the incentive awards.  See Transcript of May 19, 2009 Proceedings (Docket # 316) at pp. 58-70.  After the May 2009 preliminary approval hearing, counsel notified the Court that the named plaintiffs had met and agreed to voluntarily reduce the amount of their service awards from $75,000 to $50,000.  The named plaintiffs further agreed to ask the Court to allocate the additional funds resulting from the reduction towards the recovery of the absent class.  See Transcript of October 23, 2009 Proceedings (Docket # 335) at p. 69; Stipulation and Order dated August 24, 2010 (Docket # 350).

The named plaintiffs' proposal to voluntarily reduce the proposed incentive payments by one third diminishes but does not eliminate the Court's concerns.  The disparity between the recovery for the named plaintiffs and the absent class members is still significant.  Asking the Court to approve an "across the board"

----

decide whether the terms of the negotiated settlement are "fair".  Unlike the Court, the mediator is not a fiduciary to the absent class members and has no way of knowing or considering the merits of objections that may be filed during the settlement approval process.

payment of $50,000 to each named plaintiff also seems peculiar given that there has been no factual showing of equal involvement in the burdens of prosecuting the litigation.  Indeed, as developed during the final fairness hearing, some of the named plaintiffs began their work as class representatives in 2004 while others began much later.  For example, Thomas Gainey did not become a named plaintiff until 2007 and yet the Settlement Agreement values his contributions to the Class as equal to others who have been a class representative for twice as long.  On the other hand, the named plaintiffs are steadfast and unanimous in seeking equal service awards despite disparate contributions of time and effort and I would be remiss if I did not take that fact into consideration as well.

The bottom line is that it is difficult, if not impossible for the Court to calculate with mathematical certainty the "value" of the stigma, the stress, the isolation, the risks and the hardships associated with stepping forward and agreeing to have your name added as a representative plaintiff in a suit such as this.  What I can do with certainty is acknowledge the toll such a public role in such a public case would and did take on the named plaintiffs.

Several of the named plaintiffs spoke at the final fairness hearing and the Court was pointed in asking them to explain why the "across the board" service awards were justified.  None of the

plaintiffs who spoke were more eloquent or persuasive than Courtney Davis.  Her pro se lawsuit filed in California many years ago was the driving force behind what is now a nationwide class action lawsuit on the verge of a multi million dollar settlement that provides equitable relief to protect future Kodak employees of all races and backgrounds.  Ms. Davis explained why she started the lawsuit and the toll it has taken: "I have sacrificed my career, my personal security, and overall general welfare as a named plaintiff.  But I have withstood all these things that have been brought against me because of my belief in the God-given right to express oneself through meaningful work, and to be paid a fair and equitable wage for the fruits of one's labor."  See Transcript of November 5, 2009 Proceedings (Docket # 336) at pp. 94-102.  Ms. Davis's testimony at the final fairness hearing was compelling and pays tribute to why substantial service awards are important and appropriate in class action employment discrimination cases such as this:

> The named plaintiffs have borne the brunt of the hardship
> during these many years of litigation where others would
> not and could not, so that the next generation doesn't
> have to go through the pain.  . . .  [T]his has not been
> an ordinary case, and as such, we have been required to
> be more than ordinary named plaintiffs.  And to that end,
> the incentive awards as proposed are appropriate, given
> the risks and subsequent injuries that have been incurred
> as a result of stepping forward.  The named plaintiffs
> have labored in collaboration, not alone as separate
> individuals, but together as one body.  Each has

contributed something without which the others could not
have been sustained through these many long years.  Each
has been the eyes, the ears, the mouth, the heart, the
hands and feet that have moved the body – the class —
forward in good faith to arrive at this proposed
settlement.


Id. at pp. 101-102.[16]

---

[16] Ms. Davis's comments were consistent with the point made by one
commentator with respect to the "value" named plaintiffs bring to
employment discrimination class actions ("EDCAs"):

> Courts seldom recognize that the named plaintiffs bring
> important factual expertise to EDCAs, including necessary
> knowledge of the patterns and practices of the employers,
> a necessary component in many EDCAs.  Information about
> the employer's general decision making, promotion and
> hiring practices, and delegation of duties, are examples
> of the types of information about the employer that named
> plaintiffs provide, both in the investigative and
> discovery phases of the case. At the tail end, the
> advantage to class members is brought through named
> plaintiffs' participation in settlement negotiations,
> consent decrees, and trials, which often results in
> increased employment benefits and workplace fairness for
> all class members.  This added value that employment
> discrimination named plaintiffs bring to investigations,
> prosecutions, and judgments is not easily quantifiable in
> that a formulaic accounting of hours of time spent on the
> case does not reflect the nature of the benefits.
> Instead of taking a restitutionary account of the time
> spent, courts should make a finding that recognizes the
> full spectrum of benefits brought to the case by the
> named plaintiffs.

Nantiya Ruan, Bringing Sense to Incentives: An Examination of
Incentive Payments to Named Plaintiffs in Employment Discrimination
Class Actions, 10 Emp. Rts. & Emp. Pol'y J. 395, 424 (2006)
(footnote omitted).

Had the Court been asked to set the amount of the incentive awards, I might not have chosen the same formula proposed here. But while I recognize that the Court serves as a fiduciary to protect the interests of the absent class members, even as a fiduciary "it is not the Court's prerogative to pick and choose terms of the settlement, redact portions of the agreement, or substitute terms more to the Court's liking. Rather, the Court's duty is to evaluate the settlement as a whole, and determine if the settlement as a whole is fair, reasonable, and adequate." McBean v. City of New York, 233 F.R.D. 377, 382 (S.D.N.Y. 2006).

Upon consideration of all these factors, and based on the unique facts of *this* case and *this* settlement *as a whole*, I find that the voluntarily reduced service awards, while high, are ultimately fair and within a range of reasonableness appropriate for approval.[17]  Pursuant to stipulation executed by the parties, and class counsels' November 30, 2009 letter to the Court, I direct that the additional monies available as a result of the reduced service awards be assigned and distributed to "Category C" class members who did not sign any release of claims.  Furthermore, and based on the legal authority set forth in counsels' November 30th letter, I find that the modification of the Settlement Agreement

---

[17] I similarly approve the other service awards set forth in the Settlement Agreement as being within a range of reasonableness.

necessary to reduce the service awards from $75,000 to $50,000 will only benefit members of the Class and therefore a supplemental notice to the Class is not required.

## Conclusion

For the reasons stated above, the motions for final approval of the Settlement and for certification of the Settlement Class (Docket # 324), and for final approval of the service awards (Docket # 321), are **granted**.   The Court further **denies as moot** plaintiffs' motion for protective order (Docket # 328).

SO ORDERED.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: September 3, 2010
Rochester, New York

59